60 U.S. 241
 19 How. 241
 15 L.Ed. 612
 THE NEW YORK AND VIRGINIA STEAMSHIP COMPANY, OWNERS OF
THE STEAMER ROANOKE, APPELLANTS,
v.
EZRA CALDERWOOD, THOMAS C. BARTLETT, DEXTER
CARLETON, JOSHUA NORWOOD, PHILANDER CARLETON, ENOS COOPER, AND
SETH COOPER, LIBELLANTS.
 December Term, 1856
 
 THIS was an appeal from the Circuit Court of the United States for the southern district of New York.
 It was a libel filed by Calderwood, and the other owners of a schooner called the 'Sprightling Sea,' against the steamship Roanoke, her tackle, &c., in a case of collision at the place and under the circumstances stated in the opinion of the court.
 In July, 1853, the district judge decreed that the libellants should recover against the steamship the damages occasioned by the collision, and referred the case to a commissioner to ascertain the amount.
 In September, 1854, the commissioner reported that there was due to the libellants, for the value of the vessel at the time of the collision, after deducting the amount for which the vessel sold $4,442.00
 Amount added to the value above by court 200.00
 The value of the freight 162.00
 Interest on the above amounts, from Oct. 17, 1852 672.56
 ---------
 $5,476.56
 The sum of five thousand four hundred and seventy-six dollars and fifty-six cents.
 This report was confirmed by the District Court, and, upon appeal, the decree was affirmed by the Circuit Court, an appeal from which brought the case here.
 It was argued by Mr. Van Winkle for the appellants, and Mr. Benedict for the appellees.
 In a case of this kind, where the points of law are connected with the evidence, they can only be stated in general terms, although they may not be understood by the reader without a recital of the evidence. They were these on the part of the appellants. Mr. Van Winkle, after stating his version of the case, contended that the schooner was clearly to blame.
 1. She was negligent; she was proceeding up a narrow river in the night time, without a pilot on board, without a light in her binnacle, and without a light displayed in any part of her hull or rigging. The steamer was moving as slowly as she could by steam; had three lights displayed, which were visible for miles; had a competent lookout, and at the approach of the danger, in the emergency, ported her helm. If the light first seen on her larboard bow was that of the schooner, she still did all she could do by hugging the easterly side of the channel, so as to pass the schooner on the larboard hand. (Trinity House Rule of 30th Oct., 1840.)2. It is the duty of a sailing vessel in a river or roadstead to carry a light at night, conspicuously displayed in her rigging: if not imperative on her to do so, it is a precautionary measure, dictated by prudence, and if neglected, precludes a recovery, except for wilful damage. (The Rose Gilmor, 2 Wm. Rob., 4; The Columbine, Norwood, Ibid., 33.)
 3. If the schooner was not to blame, or not so much so as to render her liable, then it was a case of inevitable accident, and the loss must remain where it fell. (Stainback v. Rae, 14 How., 532.)
 4. The true state of the case seems to be, that the two vessels, when they respectively discovered each other, were approaching on opposite courses on a line, or on parallel lines so close as to amount to the same thing; that the steamer ported her helm, bore off to the starboard, close to the edge of the channel, which is here very narrow; but the schooner, through mistake or mismanagement, changed her course, fell with the wind, and ran across the steamer's bows.
 If this be so, the steamer was not the cause of the accident, but the schooner was.
 5. But, admitting that the schooner kept her course, the steamer, as in duty bound, tried to pass to the leeward of her. The schooner's navigators had no right to persist in their course, when they knew, or ought to have known, by so doing they incurred the imminent danger of forcing the steamer ashore, in her endeavors to pass to the leeward. It comes within the exceptions laid down in St. John v. Paine et al., (10 Howard, 582.)
 Mr. Benedict's points were the following:
 I. The plan of the position of the vessels at the time of the collision, asserted by the defendants, and proved by them to be a fair plan of the place of collision, exhitits the schooner close in shore, in a deep bay, heading along shore, and the steamer far out of the channel—also close in shore, heading at the schooner—a position so surprising as to put the steamer on her defense, with the strongest presumption against her—the wind being about south, and the schooner close-hauled on the privileged tack. They do not produce a lookout. The captain and pilot say they had a lookout. If so, the not producing him is ground of strong suspicion.
 II. Their helmsman, Henson, is called to explain, and he says, 'It was a kind of cloudy night; once in a while you would see the stars; it was not very thick or cloudy.' This is corroborated by all our witnesses and is true, although the captain and pilot swear it was pitch dark; could hardly see the width of this room. He says, also, 'The steamer was running N. W. half W., pretty much down the channel, rather more on the east, if anything.' 'There was ample room to have gone clear of her.' Under these circumstances, they would never come together.
 They, however, came together, the steamer having changed her course, before the collision, towards the east shore. 'The pilot told me to keep her a little more to the east. He told me to port the helm, to give her more room. The next words he said were, 'hard a-port."
 'Before we (steamer) changed our course, she was heading about down the channel. After we changed, she was heading towards the east shore.
 The steamer struck the schooner, and cut her half in two.
 I take this as the best account of the state of things in the steamer, for, although their other witnesses vary from it, it is quite clear that the man at the wheel is altogether the most reliable, and the pilot and the captain evidently are so much biased as not to be quite reliable. The weight of testimony is overwhelming in favor of this account of the matter.
 III. The schooner was close-hauled, jam on the wind, her starboard tacks aboard, and continued so; all our witnesses swear to this. They know, and they alone know, how our sails were trimmed; and as soon as we saw the steamer's approach, we held up forward a good signal-light, and we were as close in shore as possible.
 The testimony of some of their witnesses, that it was so dark that they could not see half the width of the room, although not true, is evidence that they did not see us, and are not, therefore, reliable witnesses as to our position, &c.
 IV. By the settled law of navigation, the steamer is always held to have a free wind. She has so, in fact, being moved by a force within herself, and under her control. She makes the wind blow as she pleases, and she is therefore bound to avoid a sailing vessel. At this time she had also the outside atmospheric wind free, and the schooner was close-hauled on the wind on her starboard tack. On all grounds she had the right to hold her course, and the steamer was bound to avoid her.
 V. The alleged declarations of the captain are of no value. They are highly improbable, in the sense in which they are offered. He says he never said so. What he did say may have been misunderstood or misremembered, so as to convert the mere language of civility into that of deliberate judgment, or he may have been adroitly led to say what he never intended to say. The question is not what the master said weeks afterwards, but what are the facts. He could not thus destroy the rights of the owners.
 VI. There was a vessel at anchor on the western shore, a little further down, with a light up, and we showed a warning light just before the collision.
 The probability is, that on board the steamer they came to the conclusion that the schooner had changed her course, by transferring their first observation of the vessel at anchor, with a light up, to the schooner with its signal light temporarily exposed; and from these negligent observations, supposing both vessels to be one, they mistook the position of the schooner, and endeavored to cut in between her and the shore, when she was within a few feet of the shore, and this caused that collision. If the steamer had kept the channel, or had taken a sheer to westward a minute before collision, she would have passed clear of us.
 Mr. Justice CAMPBELL delivered the opinion of the court.
 
 
 1
 This is a case of collision, in which the steamship Roanoke is charged with having carelessly and negligently run into and afoul of the schooner Sprightling Sea, in the Elizabeth river, Virginia, in October, 1852.
 
 
 2
 The facts disclosed by the pleadings and proofs are, that the schooner was ascending the river between 10 and 11 o'clock, P. M., and sailing at a rate of six miles per hour, with the aid of the tide. She was close-hauled, on her starboard tack, at a time when she descried the steamship descending the river, on her voyage to Richmond. The collision occurred on the eastern side of the river, 'out of the ship channel,' 'near an edge of shoals,' and 'within a length or two of them.' The object of those who managed the schooner was to avoid all danger, by leaving as large a space as possible for the steamer, whose lights had been seen. For this purpose, they approached as nearly as possible the eastern shore the usual shore, for vessels navigated as she was, to ascend the river. The schooner did not carry a light in her fore rigging; but one was exhibited from her breast-hook some time before and till the time of the collision; and the steamer was hailed, and told to keep off.
 
 
 3
 The night was 'dark and rainy;' the steamer was not running at any time at an improper rate of speed. The officers of the steamship discovered the light on the schooner, and supposed it to belong 'to a vessel at anchor;' but they say the 'light disappeared, and the next time they saw it, it was near by, under the bow of the steamer.' The probability is, that the officers of the steamship were mistaken in their conclusions in reference to the course of the schooner, and under that mistaken impression went to the eastern side, and thus encountered her. No orders were given by the pilot in respect to the management of the steamer till the instant of the collision.
 
 
 4
 This court has decided that neither rain, nor the darkness of the night, nor the absence of a light from a barge or sailing vessel, nor the fact that the steamer was well manned, and furnished, and conducted with caution, will excuse the steamer for coming in collision with the barge or sailing vessel, where the barge or sailing vessel is at anchor, or sailing in a thoroughfare, out of the usual track of the steam vessel. In the present instance, the steamer had notice that a vessel was before her, and was near her track, and, under the circumstances, she was bound to take efficient measures to avoid the schooner.
 
 
 5
 The only facts we notice in the management of the schooner, which have occasioned a hesitation to affirm the decree, are the absence of a licensed pilot, and that the schooner did not exhibit an efficient light. The proofs in the case do not allow us to charge these omissions as indications of negligence; but, that the case may not be misunderstood, we assert that the ruling principle of the court is, that an obligation rests upon all vessels found in the avenues of commerce to employ active diligence to avoid collisions, and that no inference can be drawn from the fact, that a vessel is not condemned for an omission of certain precautionary measures in one case, that another vessel will be excused, under other circumstances, for omissions of the same description.
 
 
 6
 The decree of the Circuit Court is affirmed.