## THE DREW.[1]

### McDONALD v. THE DREW.

*(District Court, S. D. New York. June 11, 1888.)*

COLLISION—VESSEL AT ANCHOR—STEAMER OUT OF USUAL COURSE—ABSENCE OF ANCHOR LIGHT—CONFLICTING TESTIMONY—WEIGHT OF PROOF.

 Libelant's schooner K. was lying at anchor on the western side of the Hudson river at night in the midst of a violent gale, when she was run into by the passenger steamer Drew, on her way down the river from Albany to New York. The evidence was very conflicting as to the existence of any anchor light burning at the time of the collision, the light having for some reason

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

become extinguished. *Held,* that the schooner was on that ground in fault. But, it appearing also that, when struck, she was lying to the west of the usual course of steamers, on a well-known anchorage ground, where the steamer should have known that vessels were liable to be anchored in the prevailing violent gale, *held,* that the steamer was in fault for running out of her usual track, near such an anchorage ground.

In Admiralty.   Libel for damages by collision.
*Goodrich, Deady & Goodrich,* for libelant.
*W. P. Prentice,* for claimant.

BROWN, J.   At about half past 4 o'clock in the morning of November 16, 1887, during a violent gale from the north-west, the libelant's schooner Robert Knapp, lying at anchor about half a mile below Caldwell's point, in the Hudson river, was run into by the steamer Drew, on her trip from Albany to New York.   This libel was filed to recover the damages.

Many witnesses on behalf of the claimant insist that the schooner was lying in the usual track of the steamer, and that she exhibited no anchor light, so that she was not seen until the Drew was within 75 or 100 feet of her, when she was disclosed by the illumination of the Drew's head-light, and collision was inevitable.   For the libelant it is contended that she was at anchor to the westward of the usual course of steamers, and that she had a good light burning up to the moment of collision. At Caldwell's point there is a sharp bend in the river of at least six points. Above the point the general course is downward about S. E. by S.; below the point, about S. W. by S.   Immediately below the point the line of the shore runs, according to the map submitted, about W. by S. for more than half a mile, and then about S. W., forming a kind of bay below the point, in and below which is a common anchorage ground, and a convenient shelter against violent winds from the west and the north-west.   The schooner had come to anchor there on account of threatening weather, during the afternoon previous, a little below Caldwell's dock, which is about half a mile below the point.   The master testified that he anchored first about 300 feet from the shore; that at 1 o'clock at night the wind blowing heavy, all hands were called, and 30 fathoms more of chain given to the anchor, and an additional anchor dropped, with 15 fathoms of chain; and at the same time the light, attached to a lanyard suspended from the fore-rigging and about 15 feet above deck, was trimmed and renewed.   The captain was up and down all night. Just before the collision he was looking to the southward, astern, to take the range of some objects in order to determine whether the schooner was dragging her anchor.   He did not hear the Drew's approach until she was close aboard.   He says that the light was extinguished by the shock of the blow, and that immediately after the Drew had passed without stopping, he took down the lantern, found it still hot, with the wick red, the glass cracked, and a few small holes broken through it.   At about 2 o'clock at night the tug-boat W. E. Street came to the landing, and anchored between the shore and the Knapp.   Her pilot testified that the Knapp's light was then shining brightly.   About half an hour afterwards

the tug Osceola also came to anchor just above the W. E. Street, and in coming in, her tow just escaped collision with the Knapp. Her captain and pilot both testify positively that there was no light at that time on the Knapp. The testimony of the lookout on the Drew was not taken in consequence of his illness. Her captain and three quartermasters, who were in the wheel-house, all testify that no light on the Knapp was visible, and that, if there had been, it would have been seen, and the Knapp easily avoided. Soon after the collision the lamp was relighted and hung up; but the wind blew out the light. The lantern was produced on the trial, showing a crack in the glass and some small holes broken in it, which the master testifies was done by the collision.

There is great difficulty in dealing satisfactorily with such contradictory testimony in regard to the Knapp's light. But where there is a concurrence of many persons, who testify that no light was visible; who were in a position to see it, if it was visible; whose interest and duty and safety were involved in observing it; and who, as in this case, did see other lights nearer the shore, but did not see the light in dispute; and where there is nothing to indicate negligence on their part; and a collision occurred which might easily have been avoided, and would naturally have been avoided, if the light had been visible and seen; and when their testimony is confirmed, as in this case, by other disinterested witnesses on another vessel, who also testify that no light was seen,—the weight of evidence must be deemed to be that there was no light shining at the time of collision. If this lantern was not quite tight before the collision, the high wind that prevailed might have blown it out not long before; or from insufficient filling it might have burned low, so as to show the red wick testified to by the libelant. Indeed, when a lamp is well supplied with oil, a sudden extinction of the light does not, I think, usually leave the wick red. The fact, therefore, to which the master testifies, that when he took the light down shortly after the collision the wick was afire, is a pretty strong indication that the light had gone out gradually through want of oil, and not by the sudden blow of the collision. *Chamberlain* v. *Ward*, 21 How. 548, 564. I feel constrained, therefore, to hold, upon the testimony of so many witnesses, that the light was not properly burning at the time when the Drew approached, whatever may have been the cause of its failure. *The Royal Arch*, 22 Fed. Rep. 457; *The Narragansett*, 20 Blatchf. 87, 11 Fed. Rep. 918; *The Sam Weller*, 5 Ben. 293; *The Isaac Bell*, 9 Fed. Rep. 842; *The State of Alabama*, 17 Fed. Rep. 847; *The Erastus Corning*, 25 Fed. Rep. 572; *The Johanne Auguste*, 21 Fed. Rep. 134, 140; *The Alaska*, 22 Fed. Rep. 548, 551; *The Amboy*, Id. 555.

2. I must hold the Drew also to blame for running so far to the westward out of the usual track of steamers, and at so high a rate of speed, —from 15 to 16 miles an hour,—over a known anchorage ground, when through the violent gale of that night many vessels were likely to be at anchor in that locality.

One of the quartermasters of the Drew estimates the schooner at about 400 feet outside of the two tows, which had lights, and in the high wind

were tailing directly out from the dock. As the schooner was somewhat below these boats, she would not, on that estimate, be as much as 400 feet further out in the river. This is the highest estimate of the schooner's distance from shore that is based on specific *data*. It is more than twice the distance stated by several of the libelant's witnesses, and it is somewhat greater than the estimate of the captain of the Street, who was in a position to judge pretty accurately. The tows did not extend over 800 feet from the shore, and, assuming, therefore, that the schooner was as much even as 1,200 feet from the shore, an examination of the map submitted shows that the Drew, in order to collide with the schooner at that distance from shore, must have gone more than a quarter of a mile nearer the shore than the ordinary course of such steamers in that part of the river. The usual course testified to is to round the point from 600 to 1,200 feet distant, which agrees with the marking of the chart; and below the point to steer S. W. by S. This would carry the steamer a full half mile from shore abreast of where the Knapp lay. The master testified that when the wind is high from the westward they steer more to the westward, to make up for leeway. Whether at this time the course actually made was more westerly than was intended; or whether, on account of the high wind, the Drew intentionally hugged the westerly shore more than usual, it is certain from the position of the schooner, which is pretty clearly established, that the Drew was far to the westward of the usual track of such steamers.

In the case of *Steam-ship Co.* v. *Calderwood*, 19 How. 241, 246, the supreme court say:

"This court has decided that neither rain, nor the darkness of the night, nor the absence of a light from a barge or sailing vessel, nor the fact that the steamer was well manned and furnished, and conducted with caution, will excuse the steamer for coming in collision with the barge or sailing vessel, when the barge or sailing vessel is at anchor, or sailing in a thoroughfare, out of the usual track of the steam-vessel."

It was not consistent with reasonable prudence, nor with due regard to the safety of other vessels, for a steamer of the speed of the Drew to run so far to the westward of her usual course, at night and in a gale of wind, over, or in very close proximity to, a well-known anchorage ground for other vessels, which she must have known were likely to be lying there for shelter. For this want of reasonable prudence, under such circumstances, I must hold her also to blame, and the damages must be divided. *The Lydia*, 4 Ben. 523; *The Isaac Bell*, 9 Fed. Rep. 842.