## THE ST. NICHOLAS.

### JONES et al. v. THE ST. NICHOLAS.

(District Court, S. D. Georgia, E. D. December 14, 1891.

1. RECEIVERS—SUABLE WITHOUT LEAVE.
    Under the provisions of Act Cong. March 3, 1887, (re-enacted August 13, 1888,) a receiver may be sued for a marine tort in another district, without leave of the court appointing him.

2. ADMIRALTY JURISDICTION—DEATH BY WRONGFUL ACT—ESTOPPEL.
    Many persons were killed and others injured by the collision of a river steamboat with a railroad bridge, in Georgia. The boat was libeled by persons injured,

and, on petition of the owner, under the limited liability act, the representatives of the persons killed were made parties, and enjoined from suing elsewhere. *Held*, that by this action the owner was estopped from denying the right of such representatives to share in the fund realized from the sale of the boat, if negligence was found, though the Georgia statute, giving a right of action for wrongful death, creates no lien therefor.

3. SAME—EFFECT OF STATE STATUTES.
A federal court sitting in admiralty may enforce a liability for wrongful death created by state statute, when the death is the result of negligence on the part of a steam-boat navigating a river of the state. *Quere.*

4. COLLISION—LOOKOUT—RIVER STEAMER.
Where a river steam-boat which carries no lookout at the bow, as required by rule 10 of the board of supervisors' regulations, collides with a draw-bridge at night, and thus causes injuries to her passengers, the burden is upon her to show that the want of a lookout did not in any manner contribute to the accident. *The Farragut,* 10 Wall. 334, distinguished.

5. SAME—CUSTOM.
The fact that other boats running on the same rivers do not carry any lookout except the pilot or helmsman is immaterial, since no practice which is contrary to a rule having the force of a statute can create a valid custom.

6. SAME—APPROACHING BRIDGE.
It is negligence for a river passenger steamer to approach the locality of a railroad draw-bridge at night at such a rate of speed as to prevent her complete control by the master, especially when there is no uniformity in the method of placing lights to indicate whether the draw is open or closed.

In Admiralty. Libel by Henry Jones and others against the St. Nicholas for personal injuries. Decree for libelants.

*Lester & Ravenel,* for libelants.

*R. R. Richards* and *W. R. Leakin,* for respondent.

SPEER, District Judge. The libel filed in this cause alleges that Henry Jones, Louisa Giles, Joshua Giles, her husband, and 37 other persons were passengers on board the steam-boat St. Nicholas, Frank Boulineau, master, on July 20, 1889. The St. Nicholas was a regularly licensed and enrolled steam-vessel, and was engaged in navigating the inland rivers of Georgia as a common carrier of goods and passengers between the ports of Savannah and Brunswick, in this state. The particular voyage on which she was engaged at the time of the incidents described in the libel was from Savannah to Brunswick through the inland passage. Libelants were recognized as passengers for that voyage, which was commenced about 8:30 o'clock P. M. on the day above mentioned. After proceeding on her course for about one hour, the St. Nicholas collided with the draw-bridge across St. Augustine creek, the draw-bridge of the Savannah & Tybee Railway Company, which was at the time closed. That at the time of the collision the vessel had just turned out of the Savannah river into St. Augustine creek, and, after proceeding in said creek from one-half to three-quarters of a mile, collided with the draw-bridge. The collision rendered it impossible for the steam-boat to proceed further on her voyage, and she accordingly returned to Savannah.

It is further averred that by the collision all the forward part of the saloon and hurricane deck of the boat was carried away, or crushed in and caused to fall to the lower deck, causing the libelants, most of whom were on the saloon deck, to be thrown violently against the deck or to

fall to the lower deck, and to be crushed and bruised by the falling timbers of the deck and the timbers of the draw-bridge, under which the boat was forced, thus causing the injuries which are set out in detail in the libel. These are very numerous and various. It will suffice, to indicate their general character, to state briefly that Henry Jones, it is alleged, was crushed and bruised in such a manner that he lost his right eye, and was so crushed and bruised in his body and person as to render him incapable to follow his ordinary vocation, which was that of a porter in a store. He suffered great bodily pain and anguish, and was confined to his house and bed, and had to employ the services of a physician and of a nurse to treat him for his injuries. Louisa Giles, being in that part of the steam-boat which was forced under the bridge, was caught between the bridge and the decks of the steam-boat, and crushed to that extent that her right thigh and right arm were broken, and her face and body badly bruised. Mary Anderson was caught between the bridge and the decks of the steam-boat, and received serious injuries in her spine and left hip, and had her right arm and right shoulder seriously injured. William Brown received serious internal injuries, and since then has not been able to breathe with freedom; has not been able since then to follow his ordinary avocation of mattress-maker and carpenter. Cecillia Beasley was knocked on the head, her left shoulder dislocated, and chest crushed. Her memory and hearing have been affected. Most of the injuries, as described, are serious, and generally expenditures for physicians and nurses have been made necessary, it is alleged; and, wherever the party injured was a married woman, her husband has been joined as a libelant to recover for the loss of the comfort and services of his wife and for his outlay in securing medical attention and nursing for her.

There are several interventions filed seeking to recover damages for the deaths of several passengers who were crushed and bruised in the collision to that extent that they either were taken up dead or died after lingering for a short time. These interventions are brought by parties who, under the laws of Georgia, would be entitled to recover for the unlawful homicide of a person bearing the relation of that occupied by the several passengers who were killed to the several interveners, respectively. There are yet other interventions by which passengers who were injured prefer their claims in that form for damages and compensation.

Since the court has confined its attention to the question whether or not the St. Nicholas is liable, as claimed, it will not be necessary to give a more detailed statement of the character of the injuries and the amount of damages claimed by the libelants.

The grounds of negligence set forth in the libel are as follows: The bridge with which the steamer collided had been constructed across the St. Augustine creek for a considerable time. Its position was well known to those engaged in navigating the inland route between Savannah and Brunswick. That at the time of the collision the draw-bridge was marked by two red lights, one of which, by an amendment to the libel, is described as being in the center of the draw, and the other on

the western side of the draw, or abutment of the bridge. These lights were visible to persons approaching the bridge from the Savannah river through St. Augustine creek. The lights were in the position where they usually were when said bridges were closed. That the master of the St. Nicholas was himself acting as pilot, and so negligently managed her as to cause her to violently collide with the bridge, force her bow under the draw, and thereby injure libelants in the manner described. It was further negligent, it is charged, that the master did not so regulate the speed of his vessel as to have her under full control until he had ascertained that the draw was open; and that it was negligence to proceed so near the bridge at such a rate of speed as to render it impossible for him to arrest his boat, and thereby prevent the collision. A further ground of negligence is that as the steamer was approaching the bridge it was the regular schedule time for the passage of the passenger train of the Savannah & Tybee Railroad. The train was then actually approaching the bridge, and it was negligence, carelessness, and unskillfulness on the part of the master of the boat to approach the bridge at such a rate of speed as, under the circumstances, would render it impossible for him to escape the danger resulting from the fact that the bridge must be closed for the passage of the train. It is further alleged as negligence while the steamer had on board about 500 passengers, thereby crowding her decks and greatly increasing the dangers attendant upon a collision, and while it was necessary to observe extreme care and caution in approaching the bridge at night, and especially to have a lookout at the bow of the boat to see whether said bridge was open or closed, that there was no lookout stationed at the bow, nor any lookout stationed where he could see ahead of the boat as they were approaching the bridge immediately preceding the collision, from which negligence the collision directly resulted, because by the presence of such a lookout it might have been ascertained that the bridge was closed. It is further alleged that the passengers in no manner contributed to the collision, but were quietly occupying the saloon deck which had been allotted to them, and which was a proper place for them.

Henry R. Duval, receiver of the Florida Railway & Navigation Company, has interposed a claim to the St. Nicholas, and answers to the charges of the libel. The answer recites that the St. Nicholas is owned by him as receiver. The collision with the draw-bridge is admitted, but he denies all negligence. He admits that the bridge had been built across the St. Augustine creek for a considerable time. Its position was well known to all persons engaged in navigating the inland route between the ports of Savannah and Brunswick, and also admits that the draw-bridge was marked by two red lights, one of which was in the center of the draw, and the other on the western side of the draw, or abutment of the bridge. He denies that the lights were in the position where they usually were when said bridge was closed, but, on the contrary, states that they were in the position where they usually were when the bridge was open. The master of the St. Nicholas was a pilot, a qualified and authorized navigator. The bridge is a well-known obstruction to navigation. The

tidal currents did not run parallel to the bridge piers, and it is too low, and is not properly protected by fender piles. The currents set in diagonally to the bridge, and with the best management are apt to carry boats against the bridge, so as to cause collisions. The Tybee road crosses the river at a sharp point, and the tide, both ebb and flood, runs diagonally across, compelling vessels to make an angle in going through the draw. It is a strong current, making it difficult to steer a vessel as large as the St. Nicholas through the draw without striking. Such vessel is compelled to approach the draw with some speed in order to pass safely. The master of the St. Nicholas was unable to discover that the draw was closed until said vessel was within 300 feet of the bridge, or other short distance. He then discovered that the draw was closed, and used every precaution to avoid a collision. He was in the pilot-house, and gave the proper signals to the engineer to back her all he could, which signals were immediately obeyed, and despite all their precaution, and the utmost care and diligence to avoid the collision, it was inevitable, and immediately thereafter took place.

The collision was wholly due to the neglect of the parties in charge of the bridge, who kept the draw closed, and placed the lights in such a position as to cause him to believe it was open. The usual signals were given to warn those in charge of the bridge of the coming of the steamboat. It was a dark night, with a background of trees to the bridge and the shadows from the bridge, and it was impossible for the master to discover that said draw was closed any sooner than he did. He denies that it was the schedule time of the Tybee road. He denies that it was necessary to have any special lookout, except the master himself, who was in the pilot-house; that all and singular the premises in the answer are true, and are within the admiralty and maritime jurisdiction of the court. The answer proceeds to recite the facts that the claims of libelants and interveners exceed the full value of the steam-boat, her tackle, etc., and her freight for the voyage; that others than said libelants and interveners claim to have been injured by said collision, and threaten suit therefor. Respondent is the owner and representative under his receivership; and while contesting the liability of his vessel, yet desiring a limitation of liability under the act of congress made March 3, 1851, entitled "An act to limit the liability of ship-owners, and for other purposes," as amended by the act of June 26, 1884, (section 18,) and of June 19, 1886, (section 4,) respondent petitions the court, and propounds and alleges as follows. Then follows a recital of the facts of the collision and claims of the libelants and other usual and necessary averments to a petition to limit liability under the acts of congress aforesaid, with the prayer that, if the libelants, interveners, and all others are found entitled to recover, they may have a decree for only such proportion of the damage sustained by them as the value of the steam-boat bears to the whole amount of damages sustained by all the parties to the collision. He further prays that all claims for loss, damage, or injury to persons or property by reason of the premises, and for repairs, may be here determined in this court, and proportioned according to law,

and that due appraisement may be ordered made of said steam-boat, her machinery, tackle, furniture, etc., and her pending freight at the time of the loss, he offering a proper stipulation therefor; and that further prosecution of all and any suit or suits, or the commencement of any suit or suits, against the respondent and those whom he represents as owners, in respect to any such claim or claims, may be restrained by order of this court, and enjoined therefrom.

In support of this answer, it is insisted for the respondent that the United States circuit court in Florida, by which the respondent was appointed receiver, alone has jurisdiction of any matter relating to the liability of property in its custody, and, unless that court has given leave to the plaintiffs to sue its receiver, the libel and interventions should be dismissed. In support of this proposition, *Barton* v. *Barbour*, 104 U. S. 126, 130, 131; *Heidritter* v. *Oilcloth Co.*, 112 U. S. 294, 303, 304, 5 Sup. Ct. Rep. 135, are cited. It will be sufficient, upon the last proposition, to suggest that these cases were decided before the act of congress of March 3, 1887, (re-enacted August, 13, 1888,) by which it is provided that receivers may be sued without the leave of the court appointing them, (24 U. S. St. p. 554; 25 U. S. St. p. 436,—by which it is provided that a receiver may be sued without the permission of the court by which he was appointed.)

It would be moreover, in our opinion, true, that if a receiver appointed in one district of the United States should send into another a vehicle of commerce like the St. Nicholas, that vessel would be liable, altogether irrespective of authority to sue, granted by the court by which the receivership was created, for any marine tort which it might commit. This statute, however, is controlling. *Central Trust Co.* v. *St. Louis & T. R. Co.*, 40 Fed. Rep. 426, 427.

A more interesting question presented by the answer and the arguments of the proctors for the respondent is this: Can a suit in admiralty be maintained in the courts of the United States to recover damages for the death of a human being on the high seas or on waters navigable from the sea, which death is caused by negligence? It is insisted that such a suit could not be maintained, in the absence of an act of congress or of a state statute giving a lien on the vessel therefor, and the cases of *The Harrisburg*, 119 U. S. 199–213, 7 Sup. Ct. Rep. 140, and *The Alaska*, 130 U. S. 201, 9 Sup. Ct. Rep. 461, are cited in support of this proposition. It cannot be doubted that, concerning the injuries sustained by libelants which did not result in death, it is competent for a court of admiralty, under the general admiralty and maritime jurisdiction, to adjudicate the question of liability, and to assess compensation in proper cases to the parties injured. It is, moreover, true that the laws of Georgia give a right of action in all cases for the homicide of a wife, or of a husband, or of a parent, or of a child, where the death results from a crime, or from criminal or other negligence. Code Ga. § 2971; Act Gen. Assem. Oct. 27, 1887. It is true that no lien is created by this statute on account of the death by negligence. The libelants, who were merely injured, were therefore properly before the court,

and the interveners, having the right by the Georgia statute to proceed against the receiver by an action *in personam*, if service could be effected, for the recovery of damage resulting from the death of those persons on whose account the statute of the state created the right of action, were, on motion of the respondent, and by his petition for limiting the liability under the acts of congress, necessarily made parties to this proceeding, and were restrained and enjoined from proceeding to enforce their rights elsewhere. The respondent is therefore, in the opinion of the court, estopped by his own action from denying the right of these parties to distribution, if liability is found, of the fund which he has paid into court. *Ubi jus ibi remedium.* He may not restrain and enjoin them from suing in the state courts, compel them to join in the proceeding of which this court has properly jurisdiction, and then deny that they may proceed here. Had the state law created a lien upon a vessel navigating the waters of which it has territorial jurisdiction for death resulting from negligence, it would seem that the doctrine as announced by Judge DEADY in *Re The Oregon*, 45 Fed. Rep. 62, would be applicable, where it was held that, under the statute of Oregon giving the right of action to an administrator for the death of his intestate, and giving a lien on the vessel navigating the waters of the state for any injury caused thereby, a suit in admiralty may be maintained in the United States district court for such death. In the absence of such lien, the intervenors, who sue on account of the death, being compelled by the act of congress, and the proceeding of respondent invoking it, to become parties to this proceeding, are, in the opinion of the court, entitled to proceed here, and to ask for the distribution of the fund which the respondent has provided for settlement of all liability which may be adjudged against him because of the collision from which the injuries resulted. We know that, so far as the decisions of the supreme court of the United States have gone, it is yet an open question whether a state law may have the force of creating liability in maritime cases at all, within the dominion of the admiralty and maritime jurisdiction, where neither the general maritime law nor an act of congress has created such liability. Indeed, in the case of *Butler* v. *Steam-Ship Co.*, 130 U. S. 555, 556, 9 Sup. Ct. Rep. 612, the learned justice, in delivering the opinion, remarked for the court: "On this subject we prefer not to express an opinion." And it is further true that, if a state law cannot have the force to create a liability in a maritime case at all, the interventions dependent upon death filed in this cause could not be maintained.

The question, however, is one which must be decided when it is presented, and perhaps the case at bar may afford an occasion for an authoritative declaration by one of those appellate courts whose deliverances upon the subject will be accepted with satisfaction everywhere. The passengers injured and killed had embarked on an inland voyage. It was to be entirely within the territorial jurisdiction of this state. A homicide at any point of the route which the St. Nicholas would traverse would be triable in the courts of the state, if a criminal case, or, if death ensued from criminal or other negligence at any point of the

waters traversed, the courts of the state would have jurisdiction to adjudicate all questions of liability, and of compensatory damages. Why, then, upon principle, should it be urged that because the case is maritime the state may not create a liability so necessary to compensate for the immensity of injury resulting from the death, suffering, loss, and expenditure of the unfortunate libelants, who, if their averments be true, were the victims of the most culpable disregard of duty and caution by those in charge of the St. Nicholas? Can it be that the courts of the state are entrusted with a jurisdiction which, if this were not a maritime case, could compensate the poor creatures whose relatives, in a moment of unsuspecting happiness, were crushed to death by the negligence of those to whom their safety was committed, and, merely because it is a maritime case, the courts of the United States, although having general jurisdiction of torts on waters within the admiralty jurisdiction, have no authority to assess a liability at all? Can it be further true that the court of the United States has authority under the limited liability law to enjoin them from proceeding elsewhere, and may then hold that they have no standing in that court? We think not. The courts of the United States have repeatedly enforced, in maritime cases, the liabilities created by the state statutes, such as ship-builders' liens, liens for supplies, etc. Why may they not enforce a liability in a maritime case for a homicide resulting from criminal or other negligence in a locality, and under circumstances where the state law creates the right. It is insisted that this would defeat the uniformity of practice in admiralty throughout the country; but the same argument would be as applicable to equity, and it is too late to deny that a court of equity of the United States may enforce an enlarged equitable right created by the state statute. Five hundred passengers charter a steam-boat for the purpose of a church excursion. They are, to use the language of the state law in describing them, "persons of color." Their long habits of deference to the white race make them wholly unsuspicious of the possibility of danger while their safety is in charge of white men. For months they have anticipated the pleasures of the voyage. We are told by the witnesses that as the steamer glided over the placid waters of the broad, inland stream, in the fullness of their happiness, they were engaged in singing one of the hymns of their church, when in an instant, without a moment's warning, through the culpable negligence of the officers of the vessel, there was brought about a scene of agony and despair which is rarely equaled,—bruising, laceration, mutilation, death, are inflicted upon the happy company of a moment before. It was upon a vessel licensed by the United States, under the control of the United States laws. The officers through whose negligence the wrongs were inflicted were licensed by the United States. As an original question, if these intervenors could not attach the St. Nicholas either by the process of the state court or by a proceeding in admiralty, they must go to a foreign jurisdiction,—to the state of Florida,—and make service upon the receiver, and sue him; and, as we have seen, to deny them the right to proceed now, after they have been enjoined, at

the solicitation of the respondent, from proceeding elsewhere, is wholly to deny them all redress whatever,—a denial of justice for which we will not willingly accept responsibility. We hold, therefore, the premises considered, that it is the duty of the court to entertain the interventions depending upon death.

In determining whether the negligence on the part of the St. Nicholas caused the collision, we have little difficulty. The steamer was negligent in not having a lookout at the bow of the boat, as required by rule 10 of the General Rules and Regulations of the Board of Supervisors, etc., page 42. These rules are promulgated by authority of the Revised Statutes of the United States, (section 4405,) and have received the approval of the secretary and the treasurer, and have all the force of law. A disregard of the rule having been shown, and the accident being occasioned by a manifest want of knowledge of the situation of the draw-bridge, the presumption is that it resulted from the absence of a lookout, and the facts of the case, moreover, sustain this presumption. The master of the St. Nicholas, who was also a pilot, and engaged at the wheel navigating the vessel, was really, by his position above the bridge, probably unable to see the draw. At night, on account of the trees and the darkness of the water, it was difficult, if not impossible, for him to see it, whereas a lookout stationed in the bow of the vessel, not charged in any manner with the duty of directing its course, or of following the sinuosities of the channel, could readily have discovered the closed bridge looming, as it must have done, between him and the sky. The failure to station a lookout in the bow appearing to be a positive breach of the statute, and of the rule made in pursuance thereof, it is the duty of the steamer to show that this neglect certainly did not contribute to the disaster. *The Pennsylvania*, 19 Wall. 125–135. The case of *The Farragut*, 10 Wall. 334, does not change the application of this rule, because here the proper inquiry of the master was whether the draw was open or closed, and nothing could have afforded such satisfactory evidence on that subject as the lookout in the bow of the steamer. The testimony of Ramon Noble, one of the pilots of the steamer, is that a man at the jackstaff could have seen anything on the water better than elsewhere. Richardson had been piloting the St. Nicholas, and testified that the reason why the bridge could not be seen on a dark night was because this was a low, flat place. There the railroad is very near the water. It is evident to any man of experience that one below the bridge, or on a level with it, could see it better at night than one stationed above it. Capt. Boulineau, of the St. Nicholas, himself testified that a man could not see the St. Augustine bridge from the pilot-house as well as in the bow. He would look over it in the dark. A lookout is always necessary. 1 Pars. Shipp. & Adm. p. 577; *The Gray* v. *The French*, 21 How. 184, 192, 193; *St. John* v. *Paine*, 10 How. 535; *The Sea Gull*, 23 Wall. 165. He should not be the helmsman. *The Ottawa*, 3 Wall. 268, 272, 273; *The New York*, 18 How. 223, 225; *The Genesee Chief*, 12 How. 443. Much more is it true that the lookout should not be helmsman, master, and pilot, commanding a passenger steamer running where there are danger-

ous obstructions and difficult currents, in a dark night, with a cargo of. 500 passengers. It is no reply to this for the respondent to cite the testimony of several masters of vessels that they never employed a watch or lookout except the pilot or helmsman, both of whom are stationed in the wheel-house. No such practice can be accepted as a custom, because it is in plain violation of the law.

We find, further, that the St. Nicholas was negligent in approaching the bridge at such a rate of speed as would take her from under the control of the master. The officers knew that the bridge was before them,— a dangerous obstruction, and, according to the answer of the respondent, with dangerous currents. They were bound to take measures to avoid a collision. *The Roanoke*, 19 How. 241. The distance of the St. Nicholas from the bridge when the first signal was given to stop her was not sufficiently great to prevent the collision, and, as the bridge was immovable, the fault is wholly with the steamer. Usina and Boulineau, officers of the St. Nicholas, say the steamer was 300 feet from the bridge at the time of the signal to stop. Ramon Noble, a pilot of the St. Nicholas, says she was 15 feet. Williams, deck-hand, says she was 40 or 50 feet. The engineer testifies that the wheel made about two turns, or one and a half, before the St. Nicholas struck the bridge after the signal was given. The diameter of the wheel is 22 feet. Richardson, a pilot formerly on the St. Nicholas, says she could turn in her own length easily, and stop in her own length. S. J. Armstrong testifies that after the signal to stop, the steamer struck before he had walked 10 feet, before he had gone from near the engine-room to the shaft. Witnesses for the libelants testify that they saw the bridge-man waving his light, and walking across the draw, before the signal was given. Two of them, Lewis and Miller, testify that they told Capt. Boulineau that the bridge was closed, before he discovered it. If, in fact, Boulineau had discovered that the bridge was closed when the steamer was within 300 feet of it, he might easily have turned into the marsh,—a thing commonly done by those steamers; or might have stopped the steamer altogether. As a general rule, a steam-boat can be stopped in her own length, or near that. *The Perth*, 3 Hagg. Adm. 414.

With reference to the question so much mooted in the argument, whether the lights indicated that the bridge was open or closed, while it is quite conflicting, the weight of the evidence both for the libelants and respondent indicates that the lights were in a position to show that the bridge was closed. The evidence is exceedingly voluminous, but a close analysis of it enables us to reach no other conclusion.

It is also clear from the evidence that the boatmen generally understood that there was little regularity about the lights on the bridge. Usina testified that at times he had seen no light at all. Avery testified nothing definite about the lights,—hardly ever saw them two alike; never depended on lights, because there is nothing definite about them. Swift testified: "I have seen one red light and the bridge closed, and one red light and the draw open." Ramon Noble testified: "When I don't see the lights anywhere, I stop and inquire, until they are

pointed out,—one on the east and one on the west." It is evident, therefore, that there was no uniformity about these lights, and the master of the St. Nicholas was the more culpable in steaming against the drawbridge in the dark night at the rate of seven miles an hour. On the whole, there can be no doubt whatever, in our opinion, as to the negligence of the St. Nicholas, and that the libelants are entitled to recover the entire amount of the stipulation.

A master will be appointed to apportion this fund among the libelants, after providing for the cost and expenses of the litigation, and, when his report is filed and approved, a decree will be entered in accordance therewith.

The decree was satisfied in full, without appeal.