THE MERRILL C. HART. THE A. C. CHENEY. THE SEMINOLE.

(District Court, S. D. New York. March 6, 1908.)

1. COLLISION—ANCHORAGE GROUNDS—RIGHT OF NAVIGATION.

While an exclusive use of anchorage grounds is not allowed to anchoring vessels so as to exclude other vessels necessarily going over the grounds as from wharves which would not otherwise be available, nevertheless it is not intended that such waters may be used with the same freedom as unrestricted waters, but that vessels shall keep clear of the grounds so as not to collide with vessels properly anchored there, nor embarrass those properly using the waters for purposes of navigation in connection with anchoring. Both of these classes of vessels have a prior right to the use of such waters over those not necessarily there.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 88½, 89.]

2. SAME—LIGHTS—SAILING VESSELS IN TOW ALONGSIDE.

Rule 11 of the pilot rules, relating to the lights to be carried by barges and canal boats when towed alongside, do not apply to sailing vessels which are governed by article 5 of the statutory rules for rivers and harbors (Act June 7, 1897, c. 4, § 1, 30 Stat. 97 [U. S. Comp. St. 1901, p. 2877]).

3. SAME—ANCHORAGE GROUNDS—YACHT AND TUG WITH TOW ALONGSIDE.

A collision on the anchorage grounds in the Hudson river opposite Thirty-Fourth street in the evening between a yacht going down at a speed of 12 knots an hour and a schooner in tow alongside of a tug which were stationary *held* due to the fault of both, and each held for half damages, the yacht for lack of a proper lookout, for navigating the anchorage grounds at excessive speed, for attempting to pass vessels there with insufficient margin, for failing to stop and reverse and for turning to port instead of to starboard; the tug and tow, while properly on the anchorage grounds as the schooner was about to be placed in a tow, because a colored light was not exhibited on the schooner as required by the rules.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 102.]

In Admiralty. Suit for collision.

Wheeler, Cortis & Haight, for the Seminole.
Wing, Putnam & Burlingham, for the Merrill C. Hart.
Amos Van Etten, for the A. C. Cheney.

ADAMS, District Judge. This action arose out of a collision which took place on the 5th day of August, 1907, about 9:30 o'clock P. M. between the yacht Seminole and the schooner Hart, in tow of the tug A. C. Cheney, and the latter vessel, on the anchorage grounds in the North River about opposite 34th Street.

The original libel was filed by Robins, the owner of the Seminole, alleging that the Seminole was proceeding down the North River on the New Jersey side; that when off about 44th Street, New York, those in charge sighted two white staff lights bearing about two points on her port bow which afterward proved to be the lights of the Cheney; that the Hart was made fast to the port side of the Cheney; that the Seminole proceeded down the river directing her course well to the starboard of such lights; that the Cheney thereafter veered toward the New Jersey shore, crowding the Seminole, whereupon the latter blew a signal of one whistle and ported; that an answer of two short blasts was received from the Cheney followed immediately by two more blasts; that under her port wheel the Seminole swung toward the New Jersey shore and away from the tug, but the tug swung with the schooner more and more toward the New Jersey shore and the schooner, which projected beyond the bow of the tug, finally collided with the Seminole, her jib boom striking the Seminole's fore mast, the bowsprit carrying away the Seminole's davits and port boats, and the bow of the schooner striking the Seminole's hull on the port side slightly aft of amidships. It is further alleged that the Cheney was in fault: (1) in that she attempted to cross the course of the Seminole; (2) in that she made no proper or intelligible reply to the Seminole's whistle and did not co-operate in the manœuvre indicated by the Seminole's whistle; (3) in that having the Seminole on her starboard hand, she failed to keep out of her way; (4) in that she had no proper lookout; (5) in that she took no proper and timely means to avoid collision; and that the schooner was in fault: (1) in that she carried no lights; (2) in that she had no proper lookout; (3) in that she took no proper and timely means to avoid collision.

Damages were claimed in the sum of $20,000.

The Hart duly answered and filed a libel against the Seminole, alleging that on the day in question, she was lying at anchor on the anchora grounds off Weehawken and was taken in tow by the Cheney to be placed in a river tow, which was made fast to the Weehawken stake boats, to be towed to Yonkers; that the tide at the time was high water slack and the weather clear with a light south wind; that the Hart was made fast to the starboard side of the Cheney; that the mate of the schooner was forward acting as lookout; that the tug and schooner circled around below the tow and started up the river; that when the tug and schooner had reached a point on the

anchorage grounds somewhat below the upper stake boat, the tug starboarded her wheel and proceeded slowly westward to the tow; that while engaged in this manœuvre the Seminole came down the river at a high rate of speed and struck the schooner on the starboard bow, damaging her to the extent of $2,500. The Hart alleged that the Seminole was solely in fault in that she was not in charge of a competent master; had no lookout properly stationed and attending to his duties; was proceeding at an excessive rate of speed; did not keep off the anchorage grounds; did not give proper and·timely signals to the Cheney, and did not stop and back or do anything to avoid collision.

The Cheney also duly answered and filed a libel against the Seminole, alleging that the Cheney made fast to the Hart, which was then lying at anchor off Weehawken in the North River, taking the schooner upon her starboard side for the purpose of placing her in a tow which was then making up upon the anchorage grounds at and near the stake boats, which are just below the Weehawken ferry of the West Shore railroad; that the tug and schooner then proceeded to a point near a stake boat of the Cornell Steamboat Company's towing line (the owner of the Cheney) and at that time two tows were making up consisting of tugs with vessels in tow, such tows headed down the river; that while the tugs and tows were lying within the anchorage grounds waiting for the nearest tow to move down, and about the time the tail of the tow had come to a point opposite or just below the schooner and tug, the Seminole came down the river and passed a car float on the westerly side near the buoy; that the Seminole then blew one whistle and ran into the bow of the schooner which was then lying still, doing considerable damage to the schooner; that after the Seminole blew one whistle and failed to change her course, so as to pass the tug and schooner, the tug blew alarm whistles and endeavored to back but before she could get in motion, the Seminole collided with the schooner; the Cheney also alleged that her stem was damaged in the collision to the extent of upwards of $500. The Cheney further alleged that the Seminole was solely in fault, (1) in that she was not in charge of a competent master, (2) that she had no competent lookout properly stationed, (3) that she was proceeding at an excessive rate of speed, (4) that she did not keep off the anchorage grounds and away from the tows when there was ample room so to do, (5) that she did not give timely or proper signals to the tug, and did not comply with such signals as were given, (6) that she did not do anything to avoid a collision and (7) that after indicating her course by one whistle changed her course to port.

The testimony, on the part of the Seminole, shows that she left her owner at Nyack and started down the river at the rate of 12 knots per hour, to go to her anchorage off 35th or 36th Street, Brooklyn. As she proceeded, she went to the eastward of some warships, anchored between 70th and 80th Streets, and then, it is said on her behalf, because the New York side of the river was congested with various vessels above the 42nd Street ferry, she turned to the westward. After going a short time, to about 50th Street, she saw a vessel with two staff

lights, but no other lights exhibited, and she steered to go to the right of them. She claims that after proceeding a short distance on this course, the vessel with the lights, which afterward turned out to be the Cheney, suddenly turned across the Seminole's bow and thus brought about the collision. The master, who was in charge of the vessel's navigation, marked his course on a chart of the river and showed that the place of collision was about opposite 34th Street and about two thirds of the way to the New Jersey shore. This place was well within the anchorage limits.

The master of the Cheney said that he took the Hart in tow from anchorage at a place within the anchorage limits somewhat above a point opposite 14th Street, then went down the river, turning to the eastward below the lower stake boat, the North, and reaching a point on the anchorage grounds not far from the upper stake boat, the Eureka, where he came to a stop in the water and waited for the tug Cordts, then manœuvring on the anchorage grounds preparatory to turning and proceeding up the river, to move out of the way. He further said that he was then headed to the northward and westward and had been at rest in the water for several minutes when he saw the red light of an approaching vessel, which turned out to be the Seminole; that it was then impossible for the Seminole to continue her course without colliding with the tow of the Cordts and she turned to the left and this brought about the collision with the Hart and the Cheney.

The principal question in the case is, was the Seminole justified in navigating over the anchorage grounds? It is urged on her behalf that this is of no importance because all of the colliding vessels were moving and further that:

"Navigation across the anchorage ground in the North River is not prohibited by any statute, or by any rule of court. Tugs, lighters, ferryboats, and other vessels cross to and fro on these very anchorage grounds at all hours of the day and night. The same is true of the anchorage grounds in the East River in the neighborhood of 23rd Street. It would be absurd to contend that because the law allows vessels to come to anchor at a particular place it confers upon them the exclusive right to appropriate those waters to their own use. If that were true, a regulation which legalizes anchorage in a given location would, at the same time, be an act of condemnation covering all of the dock property fronting on such anchorage ground. Manifestly that is not the case. The docks on the East River adjoining the anchorage ground are just as valuable and just as freely used by vessels approaching or leaving them as any docks in the city. It is admitted that if a vessel navigated in a location where other vessels may legally anchor, she is required to take all reasonable care to avoid such anchored vessels, but that is the sole requirement."

In the first place, it is doubtful if the tug and schooner were moving. I am inclined to believe that they were not. It is so testified by all of the witnesses on the tug and the schooner, the former claiming that when the vicinity of the Cordts' tow was reached, the Cheney stopped her headway and awaited the passing of that tow down the river. The testimony of the Seminole, if uncontradicted, would show that the tug and schooner were moving, first down the river and then suddenly across toward New Jersey. The first contention is based on the fact that no lights were seen on the vessels by those on the Seminole, excepting two staff lights and in the extremity of the col-

lision, the green light of the tug. The question of lights will be considered hereafter but it is proper to state now that the view of the Seminole with respect to anchorage grounds is not sustained by the authorities. On the contrary, it has been held that vessels ordinarily should not use the anchorage grounds for the purposes of navigation. For example in The Drew (D. C.) 35 Fed. 789, Judge Brown said:

"2. I must hold the Drew also to blame for running so far to the westward out of the usual track of steamers, and at so high a rate of speed,—from 15 to 16 miles an hour,—over a known anchorage ground, when through the violent gale of that night many vessels were likely to be at anchor in that locality."

"In the case of Steam-ship Co. v. Calderwood, 19 How. 241, 246, 15 L. Ed. 612, the Supreme Court say:

'This court has decided that neither rain, nor the darkness of the night, nor the absence of a light from a barge or sailing vessel, nor the fact that the steamer was well manned and furnished, and conducted with caution, will excuse the steamer for coming in collision with the barge or sailing vessel, when the barge or sailing vessel is at anchor, or sailing in a thoroughfare, out of the usual track of the steam-vessel.'

It was not consistent with reasonable prudence, nor with due regard to the safety of other vessels, for a steamer of the speed of the Drew to run so far to the westward of her usual course, at night and in a gale of wind, over, or in very close proximity to, a well-known anchorage ground for other vessels, which she must have known were likely to be lying there for shelter."

In The Ophelia (D. C.) 44 Fed. 941, the syllabus reads:

"1. Collision—Fog—Anchored Vessel.

Where a ferry-boat, in a dense fog, ran into a bark, which was anchored within the prescribed limits of the anchorage ground in the bay of New York, and whose position was well known to the pilot of the ferry-boat, held, that the ferry-boat should have kept off the anchorage ground entirely, as she could have done, and that the ferry-boat was therefore in fault for the collision."

In The Aller, 73 Fed. 875, 20 C. C. A. 79, a Circuit Court of Appeals decision for this district, the syllabus reads:

"Collision on anchorage grounds. Steamer with tug and tow.

A vessel which undertakes to navigate over anchorage grounds takes the risk of determining whether other vessels which she finds there are navigating or at anchor. Held, accordingly, that a steamship which, on leaving Hoboken, attempted to pass to the westward of a bark and tug on the anchorage grounds southeast of the Statue of Liberty, supposing them to be under way, and bound for the East river, was solely in fault for a collision with the bark it appearing that the tug was merely holding the latter up against the tide, while she was getting in her anchor, and that neither of them did anything to mislead the steamship. 59 Fed. 491, affirmed."

In The Newburgh (D. C.) 124 Fed. 954, this court held that steamer was in fault for navigating over an anchorage ground in the North River, in a fog. This case was reversed on appeal, (130 Fed. 321, 64 C. C. A. 567) not on the law, but because it was held that on the facts, the steamer was not on anchorage ground.

While an exclusive use of anchorage grounds is not allowed to anchoring vessels so as to exclude other vessels necessarily going over the grounds, as from wharves which would not be available without them, nevertheless it is not intended that the waters in question may be used with the same freedom as unrestricted waters but that vessels

shall keep clear of the grounds so as not to collide with vessels properly anchored there nor embarrass those properly using the waters for purposes of navigation in connection with anchoring. Both of these classes of vessels have a prior right to the use of the waters over those not necessarily there. The claim of the yacht that she was forced over the waters by the congested state of the channel of the river on the New York side, is disputed by the Cheney, which claims that there was not any such congestion in the channel, and this is sustained by some disinterested witnesses. It does not, in any event, appear but that the Seminole could have avoided the anchorage grounds by slowing her speed and picking her way on the New York side, and the conclusion necessarily is that she was in fault in going over those grounds at such a high rate of speed.

The theory of the Seminole was that the Cheney and tow were at first bound down the river and then suddenly changed to the westward and across the Seminole's bow, thus bringing about the collision. The Seminole's manœuvres, however, were not in conformity with such a theory. If the Seminole was an overtaking vessel and desired to pass, it was her duty (Rule 8) to signal the Cheney and obtain an assent to such passing but no such signals were given. Indeed no signals of any kind were given until the vessels were very close together, when the Seminole blew a signal of one blast to which the Cheney responded with alarm signals. No doubt the Seminole did not see that the Cheney was lying still but it does not follow therefrom that the latter did what the Seminole claimed. In fact, the observation on the part of the Seminole was defective in not recognizing the actual situation. Moreover her navigation was not marked by the degree of caution that a fast vessel under the circumstances should have observed.

The master said that he went toward the New Jersey shore because he considered that it was the proper place for him to be in following the rule of the road to keep to the right, without regard to the anchorage ground, which he considered, except for anchored vessels, as entirely open water. He further said that from above 42nd Street, he gradually worked over till within a half to three quarters of a mile of the Cheney, when he saw her two staff lights, bearing from two to two and a half points on his port bow; that he still kept that bearing until the vessels were almost together, through a turning to port on his part in following the "swing of the river," expecting to clear the tug "a good, safe navigating distance, within a hundred feet." He further said:

"I will state now, but I have never stated it before, that the schooner was on the port side of the tug. Q. That is very clear to you? A. Yes, sir. Q. So that you passed the bow of the tug before you collided with the schooner? A. I certainly did. Q. And that you are very sure of? A. Yes, sir."

The lookout also said:

"The tug was on the schooner's starboard side."

He further said:

"Q. Did you make more than one report of this light, the vessel that you subsequently collided with? A. Yes, sir, I reported it twice. Q. What was

your second report? A. My second report was again the same report that I made before, a white light; bright light on the port bow. Q. You never reported that you noticed those lights were getting nearer to your course? A. That is not my business to report; I reported 'Light on the port bow.' Q. At the time of the second report did you notice whether the light was nearer to you than it had been? A. Yes; that was why I reported it again. Q. Did you get any response from the bridge? A. Yes, sir. Q. What was it? A. 'All right.' Q. Do you mean that that was in answer to your last report? A. Yes; that was the answer that we generally get. Q. What did you get on this occasion? A. Well, that was the answer."

Other witnesses for the Seminole also said that the schooner was on the tug's port side, when in fact, as was subsequently admitted, she was on her starboard side. It shows that there was not the accurate observation of the schooner and tug as the Seminole contends for and I think she was in fault for this respect, as well as for navigating over the anchorage grounds at a high rate of speed, and for attempting to pass the vessels with too close a margin.

The faults alleged against the tug and schooner are numerous as appears above. The question of lights is perhaps the most important. The Seminole claims that the schooner failed to exhibit the lights required by law (Act June 7, 1897, c. 4, § 1, 30 Stat. 97 [U. S. Comp. St. 1901, p. 2877]), in that she failed to comply with article 5, which reads:

"Art. 5. A sailing-vessel under way or being towed shall carry the same lights as are prescribed by article two for a steam-vessel under way, with the exception of the white lights mentioned therein, which they shall never carry."

The lights required by article 2 are the regular colored lights for navigating vessels. It is admitted that the schooner had no such lights, but it is claimed by the schooner that she had been lying at anchor and before the tug made fast she had her anchor light up; that this light was taken down by the direction of the master of the tug who was in charge of the tow. The master of the tug testified that the law does not require colored lights but does require a light to be shown on the starboard bow of the schooner where it is plain to be seen and further that in towing alongside, the exhibition of colored lights by the tow would be confusing and misleading. Such is the rule for towing barges or canal boats. Rule 11 provides:

"Barges or canal boats towed alongside a steam vessel, if on the starboard side of said steam vessel, shall display a white light on her own starboard bow; and if on the port side of said steam vessel, shall display a white light on her own port bow; and if there is more than one barge or canal boat alongside, the white lights shall be displayed from the outboard side of the outside barge or canal boat. * * * "

This contention, however, if sustained, would substitute a different provision with respect to sailing vessels from that provided by the law and in the absence of some provision indicating an intention to make the method of towing applicable to sailing vessels in tow, article 5 must prevail.

The schooner when at anchor was exhibiting a white anchor light on her starboard fore rigging which was removed therefrom and, it was said, placed on her starboard side forward by direction of the tug.

This light, if there and visible, was not seen by the Seminole, nor could she see the tug's green light until the moment of collision as it was obscured from up the river by the deck load and the furled sails of the schooner. I do not think, however, that it should be assumed that the schooner's colored light, if shown, would not have been seen. The want of a light required by law is a grave fault and to excuse its absence, better proof should be given than has been adduced here. The Seminole was, mistakenly, relying upon the tow being bound down the river, when she was in fact headed across. The green light, if seen, would probably have been the means of correcting the Seminole's error, and its absence must be deemed a contributory fault to the collision.

The Seminole was not seen by either the schooner or the tug until a moment preceding the collision. If she had been seen and her movements watched, it would have been noticed that her approach would be a dangerously close one, if it would not actually cause a collision, and a reverse movement should have been made by the tug to take her and the tow out of the way.

The master of the Seminole said that there was nothing in the river on either side of the Cheney and tow to interfere with his navigation. The testimony, on the contrary, shows that there were two large tows in the immediate vicinity of the tug and tow, which it required care to avoid. One of these tows was ahead of the Cheney and prevented her from proceeding. It was going down the river and, probably, nearly out of the tug's way when the Seminole came along but in the latter's way, and, doubtless, instead of turning to the starboard as she claims, she actually turned to port and thus ran into the schooner and tug.

The master of the Seminole also said that when about 150 yards from the point of collision he ported his wheel and blew one whistle; that he could not then have avoided the collision by stopping and backing but the collision would have been much more serious. He also said that when that distance was in consideration that he could bring his vessel to a stop in two and a half to three lengths of 153 feet, that is from 300 to 375 feet. If this vessel was 150 yards away from the tow at the time, he evidently could have brought his vessel to a stop before reaching them, instead of which he continued at full speed, in fact did not ring the bells to stop his vessel until after the collision. The engine was stopped after the collision by the assistant engineer on duty, who said the order to stop came "right after she stopped."

The Seminole urges very strongly that the photographs showing the damage to the vessels prove that the tug must have been in motion and as the vessels came together at practically right angles, the damage can be accounted for in no other way. To my mind, this contention is not persuasive. The nature of the damage would be consistent with such a theory but does not necessarily preclude it from having been received while the tug and tow were at rest and the Seminole going fast ahead.

The whole navigation of the Seminole was lacking in care and prudence and she was in my judgment mainly responsible for the col-

lision, but such fact does not excuse the others for failing to exhibit proper lights.

There will be decrees adjudging all the vessels in fault, as above indicated. The Seminole will be held for one-half the damages and the tug and schooner will be considered as one vessel and liable for the other half. Orders of reference will accompany the decrees.