THE NEWBURGH.

(Circuit Court of Appeals, Second Circuit. April 19, 1904.)

No. 191.

1. COLLISION—MOVING AND ANCHORED VESSEL—BURDEN OF PROVING CONTRIBUTORY FAULT.

Where a steamer proceeding up the Hudson river was clearly in fault for a collision with an anchored lighter because of her excessive speed in a dense fog and her fault was sufficient to account for the collision because those in charge were ignorant whether she was or was not on the anchorage grounds, the burden rested upon her to prove clearly that the lighter was chargeable with contributory fault for being anchored outside the anchorage grounds.

2. SAME—EVIDENCE CONSIDERED.

A lighter with a tow started up North river when a dense fog came on. Having proceeded to the vicinity of 100th street above the crossing ferries, she made for the anchorage grounds on the west side of the river, and, after taking soundings and proceeding as far as she thought was safe, anchored, where she was later struck by a passing steamer, which was going at a speed of eight miles an hour, and sunk. Her exact location when anchored was not known, but the weight of evidence indicated that she was on the anchorage grounds. Held, that such evidence was not sufficient to charge her with contributory fault, the fault of the steamer being clear.

3. SAME—ANCHORING IN HUDSON RIVER—STATUTORY REQUIREMENTS.

Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 [U. S. Comp. St. 1901, p. 3543], providing that it shall be unlawful to tie up or anchor vessels or other craft in navigable channels in such manner as to prevent or obstruct the passage of other vessels, does not condemn a lighter which, compelled to anchor in the Hudson river because of a dense fog, made her way to the side on which were the anchorage grounds, as far as was considered safe, and anchored after taking soundings which indicated that she was within the grounds; the exercise of precautions commensurate with the danger being all that is required.

130 F.—21

Appeal from the District Court of the United States for the Southern District of New York.

The libel was filed by Eugene S. Belden, in behalf of the owners, insurers, master and crew of the steam lighter Clifford. The libelants appeal from a final decree of the District Court for the Southern District of New York, holding the propeller Newburgh liable for half the damages received by the Clifford by reason of a collision with the Newburgh in the Hudson River, off 104th street, at about half past 9 on the morning of December 29, 1901, during a dense fog. The Newburgh was held in fault for excessive speed. Her claimant, the Central Hudson Steamboat Company, has not appealed. The Clifford was held in fault for anchoring off the designated anchorage ground.

The opinion below is reported in 124 Fed. 954.

Samuel Park, for appellants.

Charles C. Burlingham and Charles L. Kingsley, for appellee.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

COXE, Circuit Judge. No appeal having been taken by the claimant the negligence of the Newburgh must be considered as established beyond controversy.

The single question to be determined is whether the Clifford was at fault in anchoring at the place where the collision occurred. Was she on the anchorage ground, namely, west of a line drawn through the center of the river? The testimony was taken by deposition and was submitted on briefs in the District Court, no oral argument being made. The District Judge assumed that it was conceded that the Clifford was somewhat to the eastward of the anchorage ground. No such concession is made in this court. Entertaining the idea that there was no dispute regarding the position of the Clifford the judge, very naturally, deemed it unnecessary to enter into an independent examination of the evidence bearing upon the question of location. That question is the principal one debated in this court and, after giving it careful consideration, we are led to the conclusion that the preponderance of proof is to the effect that the Clifford was on the anchorage ground at the time of the collision and that the most favorable finding to which the Newburgh is entitled is that the question is involved in doubt. Our reasons for reaching this conclusion are as follows:

First. No one knows, or pretends to state as a fact, the precise location of the Clifford. It is known that she was near the center of the river and either on or near the anchorage grounds. Beyond this all is inference and guesswork. The testimony of the master of the Clifford that "I didn't think it safe to get on any anchorage ground there—it was a good place to get in collision," has no reference whatever to the place where he actually dropped anchor. He was referring to the situation at 56th street, more than two miles below, where the anchorage ground was directly in the path of the ferries.

Second. The master of the Clifford says that he was either on the anchorage ground or "right close to it," and gives his reasons for his opinion. Before anchoring soundings were taken. The depth of the water on the anchorage ground does not exceed ten fathoms and the line showed six fathoms, indicating that he was well within the zone

of safety. It is true that when asked for his opinion as to his whereabouts the master was not altogether clear. It is manifest that he did not know exactly where he was. At one time he testified that he thought he was on the anchorage grounds. At another time he said, "I don't think I was on them. Of course, I couldn't tell or not; I was trying to avoid collision." And, again, he said he anchored on the edge. Nevertheless, the deduction from the undisputed fact that the depth of the water was but six or seven fathoms corroborates the libelants' theory that the Clifford was on the anchorage ground.

Third. The Clifford was examined by the superintendent of the wrecking company the day after the collision and he found her in the same position as when she sank, nearer the New Jersey than the New York shore, close to the channel bank on the west side of the river and well onto the anchorage ground. This would be conclusive as to her location were it not for the fact that immediately after the blow the Newburgh, with her stem still in the wound made by the collision, endeavored to push the Clifford into shoal water. There is a difference of opinion as to what the effect of this maneuver was. The libelants' witnesses think that it did not move her an inch. The claimant's witnesses, on the other hand, are of the opinion that the Clifford must have been moved, though no one seems to be able to give the distance or the direction with accuracy. The testimony of the pilot of the Newburgh that the Clifford was moved half of a mile westward from the place of collision is evidently untrustworthy, for, if the chart correctly shows the width of the river at 104th street, she would have brought up on the New Jersey shore. When it is remembered that the Clifford had out her large port anchor, with 30 fathoms of chain, that she was rapidly filling and that the Newburgh had her stem in a wound which extended to the mast, so that she was endeavoring to push the Clifford broadsides through the water, the contention that she was moved for any considerable distance does not commend itself to the court.

Fourth. We do not lose sight of the fact that "a line of three white buoys marks the east limit of the anchorage ground" and that they are located from 125th street down to Hoboken. The claimant's testimony indicates that one of these was located between 46th and 50th streets and another a little below 96th street. The master and pilots of the Newburgh testify that she passed the buoy at 50th street about 200 feet on her port side. This was two miles and more below the place of the collision and, in the absence of other proof, would seem to offer an exceedingly slight foundation for the argument that she did not cross the eastern edge of the anchorage ground at 104th street. We are unable to find a particle of testimony that any one on the Newburgh saw the buoy at 96th street before the collision. This seems to us most significant and accords with the libelants' theory. One of the Newburgh's witnesses, Monahan, testifies as follows:

"I saw two buoys. The other one was off a trifle below 96th street, that was after the collision; I was bringing the lighter back to the 86th street dock—96th street."

This would indicate that he was west of this buoy when he passed up the river, for if he had passed 200 feet to the eastward it is not clear how he could have seen it in a dense fog going from the place of collision to the dock on the New York side. However this may be, it seems evident that if this buoy had been 200 feet on her port side some one on the Newburgh would have seen it.

Fifth. The testimony of the witnesses for the claimant as to the location of the collision is confused and uncertain. One of them says it might have been off 78th, 79th or 80th street, and the others place it at about 79th street. This obvious error does not prove that the witnesses were intentionally misrepresenting the facts, but it does demonstrate the absolute impossibility of making accurate observations in the circumstances existing on the morning in question. As before stated the weight of evidence favors the libelants' contention that the Clifford was on the anchorage ground. But let it be conceded that the testimony is so contradictory and uncertain that it is impossible to locate the Clifford with accuracy. How then stands the case? The Newburgh's admitted violation of the law, her reckless conduct and excessive speed are sufficient to account for the disaster that followed. Her negligence was gross and we think the burden was upon her to prove the negligence of the Clifford.

As was said by the Supreme Court in The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 216, 37 L. Ed. 84.

"Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel."

In The Oregon, 158 U. S. 186, 197, 15 Sup. Ct. 804, 809, 39 L. Ed. 943, the same principle is re-affirmed, the court observing:

"Where one vessel clearly shown to have been guilty of fault, adequate in itself to account for the collision, seeks to impugn the management of the other vessel, there is a presumption in favor of the latter, which can only be rebutted by clear proof of a contributing fault. This principle is peculiarly applicable to the case of a vessel at anchor, since there is not only a presumption in her favor, by the fact of her being at anchor, but a presumption of fault on the part of the other vessel, which shifts the burden of proof upon the latter."

See, also, Clarita and The Clara, 23 Wall. 1, 13, 23 L. Ed. 146; The Hustler (D. C.) 100 Fed. 134; The Mexico (D. C.) 78 Fed. 653; The Ludvig Holberg, 157 U. S. 60, 71, 15 Sup. Ct. 477, 39 L. Ed. 620.

Has the Newburgh sustained the burden? Has she presented "clear proof" that the Clifford was off the anchorage ground? We think not. The master of the Clifford was confronted by a grave responsibility. The situation was one of great peril. His exact whereabouts was unknown; he had reached a point on the river where he felt confident that he was beyond the danger of crossing ferry-boats; he thought he was on, or very near the anchorage ground, and that if he kept on moving he was liable to collide with an anchored vessel at any moment. There was danger no matter what course was adopted and we are not prepared to assert that, after taking soundings, it was faulty seamanship to anchor where he says he did—"between the ferries and clear of them where I supposed every-

thing was safe." His judgment was vindicated to some extent by the discovery, after the fog cleared, that vessels were anchored both to the east and west of where the Clifford was struck. Being enveloped in a fog so dense that from the time it shut down he had not seen either shore, we are inclined to think that he exercised due caution, having in view the extraordinary perils which confronted him. The City of Lawrence, 115 Fed. 791, 53 C. C. A. 287.

But a single word need be said regarding the other accusations against the Clifford. It is argued that she did not keep a sufficient lookout and did not give proper signals. A sufficient answer is that negligence in these particulars, assuming it to exist, contributed in no degree to produce the accident. Each vessel heard the other's signals before it was possible for them to see each other. A score of lookouts on the Clifford would not have prevented the collision.

We had occasion to examine the Act of March 3, 1899, c. 425, 30 Stat. 1152, § 15 (U. S. Comp. St. 1901, p. 3543), in the case of the John H. Starin, 122 Fed. 236, 58 C. C. A. 600, and shall not attempt to define its meaning further than to say that we are convinced that it has no application to the present controversy.

The decree is reversed with costs to the libelants, and the cause is remanded to the court below with instructions to enter a decree for the libelants for the full amount of their damages with interest and costs.