## THE CANANOVA.

## THE BENJAMIN A. VAN BRUNT.

(District Court, E. D. Pennsylvania. April 2, 1923.)

### No. 179.

1. **Evidence ⚖➔77(1)—Failure to produce important available testimony authorizes inference that it would be adverse.**

    In admiralty the absence of an important witness whose testimony could have been procured by reasonable diligence warrants the inference that his testimony would not have been favorable to the party by whom he should have been called.

2. **Collision ⚖➔82(2)—Steamship held solely in fault for collision in fog with anchored schooner.**

    A steamship which in a dense fog was outside the channel and on known anchorage grounds, and proceeding at such speed that she could not be stopped on sighting an anchored vessel in time to avoid collision, *held* solely in fault for collision with an anchored schooner which was not chargeable with fault or negligence.

⚖➔For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Collision ⬡⟺85—Presumption is against moving and in favor of anchored vessel.**

Where a moving vessel comes into collision with one at anchor, in a fog, the presumption is against the moving vessel, and she must be held solely in fault where there is no evidence of negligence on the part of the anchored vessel.

In Admiralty. Suit for collision by one Lawry, master and owner of the schooner Benjamin A. Van Brunt, against the steamship Cananova. Decree for libelant.

Willard M. Harris, of Philadelphia, Pa., for libelant.
John F. Lewis, of Philadelphia, Pa., for respondent.

THOMPSON, District Judge. This is a cause of collision between the steamship Cananova and the schooner Benjamin A. Van Brunt, occurring on Monday, May 7, 1923, while the latter was at anchor in the lower part of the Delaware river.

The Van Brunt is a four-masted schooner, 1,191 tons gross, 196 feet in length, 41 feet 3 inches in beam, and 18 feet 2 inches in depth of hold. The Cananova is a steel steamship 249 feet long, 37 feet 7 inches in beam, 22 feet 8 inches in depth of hold, and 1,926 tons gross burden.

The schooner was loaded with a cargo of 1,506 tons of bituminous coal, was on a voyage from Philadelphia to Calais, Me., and had been towed by a tug on Sunday, May 6, to an anchorage about a mile or a mile and a half below Fourteen-Foot Bank Light. This light shows white for the channel, with a red sector to the west of the channel. The schooner was anchored well within the red sector, as is shown by the testimony of the master of the schooner, the master of the tug, and the pilot who brought the Cananova up the river. She dropped anchor early in the morning of Sunday, May 6, 1923. Another schooner was at anchor about a half a mile above the Van Brunt.

On Monday, May 7, there was a dense fog on the river. The Cananova had anchored at the Breakwater, taken on a pilot, and, according to her engineer's log, started up the river in the fog at 9:25 a. m. until, while running half ahead, she stopped her engines at 10:57, upon sighting the Van Brunt ahead, and at 10:58 a. m. came into collision with the schooner.

The Van Brunt was provided with a fog bell over 17 inches in diameter fastened on the forecastlehead, which was being struck with a hammer from time to time by the donkey-engineer, who was also engaged in caulking and other work on the forecastle. Those on the deck of the schooner heard the whistle of the steamship at a distance shortly before the collision, and the engineer struck the bell repeatedly with a hammer every 30 seconds. The whistle sounding again close by, he ran below, procured a larger hammer out of the engine room, and again struck the bell repeatedly and violently. Then, hearing the steamship coming through the water, and seeing that a collision was iminent, he ran aft, where the wife of the libelant rang the ship's bell, which was about 5 inches in diameter, and was fastened on the afterhouse. Meanwhile, the lookout on the steamship called out "Schooner

ahead!" Under the order of the pilot, the engines were stopped, put full speed astern, and the anchor dropped. The bow of the steamship swung to starboard, striking the schooner on the starboard side about in the forerigging, cutting into the hull, and making a hole about 8 feet wide, 15 feet in depth, and thrusting inboard about 4 feet. The schooner began to fill, the steamship came alongside, her crew assisted in patching the hole, and the steamship towed the schooner up the river to Reedy Island, where she was taken in tow by a tug summoned by the master of the steamship.

The controversy respecting the cause of the collision involves disputed questions concerning the position in which the schooner was lying in the stream, the sounding of the fog bell on the schooner, and whether the ringing of the small bell by Mrs. Lawry caused the lookout, the pilot, and master of the steamship to misjudge the position of the schooner, thereby justifying her being turned to starboard.

If the schooner, as was testified by her witnesses, was tailing with the tide up stream, it would lend considerable weight to the libelant's contention that the collision would have been averted if the steamship had swung to port instead of starboard. If, however, the schooner was swung across the channel in a changing tide, and the small bell was heard on the port bow by the steamship's lookout while the steamship was heading, as testified by the libelant's witnesses, for the schooner's port quarter, it may be that the steamship was misled as to the position of the schooner through assuming that the sound of the ship's bell indicated the natural position of the fog bell in the fore part of the schooner, and therefore justified the steamship in going to starboard, expecting thereby to clear the schooner's bow.

The respondent's witnesses testified that the tide was changing, which, if true, would be convincing that the anchored vessel was swinging on her anchor across the stream. If it was a flood tide, it would naturally cause the schooner to tail up stream. The official tide tables offered in evidence show that on that date it was low water at the Delaware Breakwater at 7:41 a. m. and high water at 2 p. m. The collision occurred about 11 a. m., and about 14 miles above the Breakwater. At this short distance above the Breakwater it is apparent that the tide must have been running in for a sufficient time before the collision to have swung the schooner about and tailed her up stream. Moreover, the testimony of the respondent's own witnesses tends to support the libelant's theory that the Cananova was not misled by the sound of the small bell.

There was considerable shiftiness in testifying by some of the respondent's witnesses. The third officer of the Cananova, Cunningham, testified that he was stationed forward at the anchor windlass with an able seaman named Garcia as lookout; that the first that he knew of the presence of the schooner was when Garcia reported a schooner ahead. The witness said he heard a bell from the schooner a little over on the starboard side. This he repeated, and then, upon further questioning, corrected himself by saying:

"No. A little on the port bow; although I paid very little attention to it because I was looking for the windlass."

This witness, the third officer, had followed the sea for 28 years, was a licensed master of ocean-going steamships, and it is extremely improbable that he would have said "starboard" when he meant "port." Moreover, the diagram drawn by the master of the steamship indicates that the heading of the steamship was such that the bell would not have sounded off the port bow even if he heard a bell near the stern of the schooner.

The pilot testified that in the location the collision occurred he would have seen the red light. He denied, however, that that was off the channel, then later admitted it was a little off the channel, but where ships go in a fog to make the lighthouse by getting the bearing of its fog horn. He afterward said:

"What I am going to say about the schooner, he had a right to anchor where he did, but he was in the way of ships coming up in foggy weather making that lighthouse. The captain knows that as well as I do."

He testified that from Brown Shoal Bell, 6½ miles below, he took a course north by northwest, his purpose being to locate Fourteen-Foot Bank Light in the fog by locating its fog horn, then to proceed up stream, passing the light to port, which would put him in the channel. He stated that before the schooner was observed he had ordered his wheel put hard aport to go north to clear the lighthouse, and afterward corrected that by saying that he had ported a little and did not put his wheel hard aport until the schooner was observed. He testified that the engines had been stopped five minutes before the schooner was observed.

It appears from the engineer's log that he did not stop the engines until 10:57, and at the same time went full speed astern. This was immediately before the collision, which the master of the steamship says occurred at 10:58.

The abstract of the ship's log filed by the master of the Cananova with the local steamship inspectors shortly after the collision is corroborative of the statement of the pilot that the wheel was put hard aport before hearing the ship's bell. The captain there states:

"Passed Brandywine Shoal Lighthouse at 10:36 a. m. Altered course to N. N. W. at 10:45 a. m. We could distinctly hear the fog trumpet on Fourteen-Foot Bank Lighthouse ahead, fog now being dense. Later at 10:57 a. m. we stopped the ship for better to determine our position, judging to be about one mile off the lighthouse. Course was altered to north, so as to bring it on our port bow, at the same time we heard a ship's bell ahead and at once rung the engine room telegraph full speed astern, and let go the port anchor. Before we could bring the ship up, we struck the four-masted schooner Benjamin A. Van Brunt of New York on her starboard bow, breaking through a little below the water line."

There is not a word in this statement concerning a bell on the port bow or putting the wheel hard aport after hearing the bell. This written evidence shows that the accident occurred because the Cananova could not be stopped by reversing the engines and dropping anchor and that her course was altered before the bell was heard ahead. The Frostburg (D. C.) 25 Fed. 451. She had taken a bearing north northwest, which took her into the anchorage for the purpose of getting her

bearings while away from the course of vessels navigating in the channel. In these circumstances, if she had been in the channel, it was her duty, under article 16 of the Pilot Rules (Comp. St. § 7854), to go at a moderate speed, having careful regard for the existing circumstances and conditions. The pilot took a course which brought the steamship where vessels were likely to be lying at anchor intending when the fog horn of the nearby lighthouse was heard to take a course into the channel, and, being in a dense fog, more than ordinary caution was required. What is moderate speed in a channel where moving vessels may take care of themselves may not be moderate speed in proceeding through a known anchorage, where the anchored vessel has no protection excepting her bell or horn. The purpose of the pilot was to get off the channel so as to get his bearings. Getting off the channel was a wise precaution for the safety of the Cananova, but was not sufficiently cautious having regard for the safety of anchored vessels.

[1] The fact that the testimony of Garcia, the lookout, was not taken when it could have been obtained is significant. The respondent called witnesses to show what efforts had been made to locate Garcia, whose testimony, in view of his position and duty at the time of the accident, was most important. The testimony does not show that any attempt was made immediately after the accident to obtain his testimony. It does appear, however, that he was a member of the crew until it was paid off. It is well settled in admiralty that the absence of an important witness whose testimony could have been procured through reasonable diligence warrants the inference that his testimony would not have been favorable to the party by whom he should have been called. The Richmond (D. C.) 275 Fed. 970; The Prudence (D. C.) 191 Fed. 993; The Georgetown (D. C.) 135 Fed. 854. We have, however, the testimony of a witness for the respondent that Garcia called out "Schooner ahead!"

A further significant fact is that the master of the schooner called out upon seeing the approaching steamship, "Why don't you starboard your helm?" which, even if it were not heard by the master of the steamship, has a bearing upon the relative positions of the vessels.

It is not shown by any evidence in the case that the master of the steamship at any time after the accident attempted to place blame upon the Van Brunt. It was admitted by him that he did assure the master of the Van Brunt that he would have no charge for towage. He did, in fact, tow the schooner to Reedy Island, where a tug procured by him took her up the river. This, at least, indicated a conciliatory attitude, not entirely consistent with a desire at that time to blame the collision on the schooner.

[2] Taking all the evidence under consideration, I find that the schooner was anchored out of the channel where she had a right to lie; that she swung around with the tide and was tailing up stream; that she was not in fault through neglect to sound the fog bell, but that it was repeatedly sounded both before and after the first blast of the steamship's whistle, and again more violently after the second blast; that the steamship had gone out of the channel in a dense fog into a known anchorage, and was endeavoring to locate her position by refer-

ence to the Fourteen-Foot Light fog horn; that the wheel was put hard aport, not because of being misled by the sound of the small bell in the aft part of the schooner, but before her pilot and master knew of the presence of the schooner, and she struck the Van Brunt before she could be stopped.

These facts being established, the law of the case is clear. The steamship, being off the channel and on the anchorage, was not going at such moderate speed as to be able to stop when the schooner was observed. The Ansaldo Savoia (D. C.) 276 Fed. 723; The Bailey Gatzert, 179 Fed. 44, 102 C. C. A. 612; The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687.

[3] The presumption, where a moving vessel comes into collision with one at anchor in a fog, and where there is no evidence of negligence on the part of the anchored vessel, is, by the well-established rule, against the moving vessel. The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943; The Newburgh, 130 Fed. 321, 64 C. C. A. 567; The Amiral Cecille (D. C.) 134 Fed. 673. The evidence on the part of the Cananova is not such as to overcome the presumption. In my opinion, this is a case of sole fault on the part of the Cananova, and not one in which damages should be divided.

Counsel may prepare a decree accordingly with reference to a commissioner to ascertain libelant's damages.