## UNITED STATES v. CITY OF NEW YORK, and Other Libels, Cross-Libel, and Petitions.

(District Court, S. D. New York. May 3, 1923.)

**1. Collision ⊕85—City of New York held liable for collision between municipal ferryboats and anchored steamship.**

Evidence as to speed of municipal ferryboats during dense fog *held* to show city of New York liable for damages to steamship with which ferryboats collided while it was lying at anchor.

**2. Collision ⊕74—Evidence held insufficient to show vessel anchored in fairway outside of anchorage grounds.**

Evidence *held* insufficient to establish that steamship, with which municipal ferryboats collided, was anchored in fairway outside of anchorage grounds.

**3. Collision ⊕25—Municipal ferry regulations held not to contravene Inland Rules or preclude city from limiting liability from collision.**

City of New York municipal ferries regulation 26, requiring ferryboats during fog to run at "half speed or less," having careful regard to existing conditions, *held* not to contravene Inland Rules, art. 16 (Comp. St. § 7889), requiring vessels in fogs to go at moderate speed so as to preclude city from limiting its liability arising from collision of ferryboats and anchored steamship.

**4. Collision ⊕125—Evidence held to show that leaking oil caused damage to grain cargo to which collision and resulting beaching contributed.**

Evidence *held* to establish that damage to grain cargo resulted from oil which leaked from tanks, and that collision and resulting beaching and listing of vessel contributed to such damage.

**5. Collision ⊕26—Deviation by unseaworthy vessel held to deprive it of benefit of exceptions in bill of lading and of provisions of Harter Act.**

Where vessel, loaded in Philadelphia, and destined for Falmouth, England, was in fact unseaworthy because of oil leaking from tanks into certain holds, but made trial trip to New York, where collision occurred, *held* trial trip was deviation which, with unseaworthiness, deprived vessel of benefit of exceptions in bill of lading and of provisions for exemption of Harter Act (Comp. St. §§ 8029–8035).

**6. Shipping ⊕3½, New, vol. 8A Key-No. Series—Government owned vessel, engaged in European food relief service, held engaged in governmental enterprise, not as merchant vessel.**

Vessel belonging to United States, and carrying cargo of grain loaded by United States

Grain Corporation, and consigned to that corporation, care of American Embassy, London, and actually engaged in European food relief service, *held* engaged in public business and not a merchant vessel, as affecting liability to suit for damage to cargo.

**7. Collision ⊜⇒144—Owners of cargo can recover full damages thereto from each party contributing to such damage.**

English rule that owner of cargo can only recover proportionate share of their damages from parties liable therefor does not apply in United States courts, where recovery of whole damage against either wrongdoer is permitted.

**8. Collision ⊜⇒144—Total damages to cargo held recoverable from one whose wrong only partly contributed thereto.**

Where damages to cargo of vessel, engaged in governmental service, was attributable in part to unseaworthiness of vessel and in part to collision, *held*, full damages might be recovered from party responsible for collision; neither government nor vessel engaged in government service being liable to suit.

**9. Collision ⊜⇒137—Owner's claim for damages to vessel deferred to claim of owner of cargo, in view of unseaworthiness and deviation of vessel.**

Where cargo belonging to United States Grain Corporation, loaded on government owned vessel engaged in European food relief service, was damaged partly through unseaworthiness and deviation of vessel, and partly from collision, *held*, government's claim for damages to vessel should be deferred to claim of grain corporation, in view of unseaworthiness and deviation.

In Admiralty. Libels (1) by the United States, as owner of the steamship Waubesa, against the City of New York, as owner of the ferryboats Queens and Mayor Gaynor, wherein the City of New York filed cross-libel against the United States; also (2) by the United States Grain Corporation, successor to the Food Administration Grain Corporation, as owner of the cargo on the steamship Waubesa, against the City of New York, as owner of the ferryboats Queens and Mayor Gaynor, wherein the City of New York impleaded the United States; also (3) by the United States Grain Corporation, as owner of the cargo on steamship Waubesa, against the United States, substituted in place of the Steamship Waubesa and the United States Shipping Board Emergency Fleet Corporation, wherein the United States impleaded the City of New York. In the first libel, decree for the United States against the City of New York and cross-libel dismissed. In the second, decree for the Grain Corporation against the City of New York and petition impleading the United States dismissed. In the third, libel and petition dismissed.

William Hayward, U. S. Atty., of New York City.

John M. Woolsey, of New York City, advocate on question of jurisdiction.

Anthony M. Menkel and John Hunter, both of New York City, advocates in respect to other questions.

Bigham, Englar & Jones, of New York City (T. Catesby Jones and James W. Ryan, both of New York City, of counsel), for United States Grain Corporation.

John P. O'Brien, Corporation Counsel, of New York City (Charles J. Carroll, of Brooklyn, N. Y., of counsel), for the City of New York.

AUGUSTUS N. HAND, District Judge. This case involves a collision between the steamship Waubesa, belonging to the United States, and the ferryboats Queens and Mayor Gaynor, belonging to the city of New York. The collision occurred on March 17, 1919, in New York Harbor, during a dense fog. The Waubesa was anchored at or near the anchorage grounds in the upper bay to the southwest of Bedloe's Island.

The United States appeared specially and filed a plea to the jurisdiction to the effect that the Waubesa was not employed as a merchant vessel, but was engaged in the European food relief service, which is alleged to be a purely governmental function.

In the first libel, the United States sues to recover for damages caused the Waubesa by the collision, and the city of New York files a cross-libel, alleging that the collisions were due to the negligence of those in charge of the Waubesa, in that the latter was anchored in the channelway, and in that she did not ring her bell as required by law, so as to notify vessels of her position at anchor.

The second libel is filed by the Grain Corporation against the city of New York, and alleges that the libelant shipped on board the Waubesa grain in good order and condition, to be carried from New York to European ports, that the Waubesa, with libelant's cargo on board, took up anchorage on the general anchorage grounds at a point to the south and east of the Statue of Liberty in New York Harbor, where the municipal ferries Queens and William J. Gaynor negligently collided with her, to the damage of the merchandise belonging to the Grain Corporation. The city of New York impleaded the United States as the one primarily liable, claiming the right to sue it under the provisions of Act March 9, 1920 (Comp. St. Ann. Supp. 1923, §§ 1251¼ to 1251¼*l*).

In the third libel, the United States Grain

Corporation, organized under the laws of the state of Delaware, alleges that the Waubesa was a general ship, engaged in the common carriage of merchandise by water for hire, and was being operated under the control and direction of the United States Shipping Board Emergency Fleet Corporation; that the Grain Corporation shipped rye grain on the Waubesa in good order and condition, to be carried from Philadelphia to Falmouth, England; that the Waubesa, instead of proceeding to Falmouth, put into the port of New York, having oil and water in the bilges, and being in such a condition that it was deemed best by those in charge of her not to proceed upon her voyage to Falmouth; that the cargo of grain was discharged in the port of New York, not in good order and condition as when shipped, but seriously injured and damaged by contact with fuel oil and sea water, for all of which damages are sought. The United States is made respondent under Act March 9, 1920, in place of the Waubesa and the Emergency Fleet Corporation, and the city of New York is impleaded under the admiralty rule, on the ground that it is primarily responsible for the alleged damage.

The question which arises at the outset is the liability of the city of New York. It will serve no useful purpose to rehearse the evidence which appears in the long record regarding the question whether the Waubesa complied with the rule in ringing a fog bell, or whether the ferryboats, in proceeding on their courses from New York to Staten Island, blew fog whistles. I am convinced that both of these things which are required by the regulations were done. It is highly improbable that Staten Island ferryboats should be going down New York Harbor in a most unusual fog without blowing fog whistles. That this should be neglected would be most extraordinary, and there is ample and convincing evidence to show that there was no neglect. The same thing is true in regard to the bell on the Waubesa. The evidence taken at the trial and contained in the depositions justifies the finding that the Waubesa did what was required by law and was naturally to be expected under the existing circumstances. The testimony of Daniel Norton, of the Queens, that he heard a bell ringing a few minutes before the collision, is an example of credible testimony from a well-appearing witness. Oscar Mueller was another disinterested witness to the same effect.

It is also unnecessary to comment at length on the evidence regarding the speed of the Queens and Gaynor. Capt. Merli of the Queens testified that he judged the speed was "from about 6 to 7 knots an hour."

Layman, engineer of the Queens, testified:

"Q. Were you running at half speed just up to the time of the collision? A. Just at the time of the collision we were half speed, I remember that distinctly.

"Q. And that half speed so far as you know was about what speed in miles? A. In miles?

"Q. Yes; per hour. A. Oh, possibly 8 miles an hour.

"Q. What is the speed of your vessel, going full speed? A. About 15, 14 to 15, miles.

*          *          *          *          *

"Q. Were you on half speed just at the time of the collision, or did you just prior to the time of the collision get a signal otherwise than half speed? A. Just prior to the collision we got a signal, we were running at half speed, and then we received a signal full speed astern."

Pilot Silva of the Queens stated that the collision occurred at 6:40 in the morning, and that he left the ferry slip at 6:25.

Capt. Robinson of the Mayor Gaynor testified that he left his slip at 8:02, and the collision was at 8:15. On a clear day he said it would have taken about 10 minutes instead of 13 to traverse the distance.

The distance when scaled on the chart seems to have been 2 nautical miles, so that the ferryboats, irrespective of any particular slowing down, were running at an average of 8 knots per hour.

Capt. Merli said that he was running at half speed when he got the signal from his mate, and "the signal I got from the mate was to go back on her, and I put her full speed astern.

"Q. Did you see the vessel at that time when he said to go back on her? A. I did not see the vessel at that time."

The quartermaster, Silva, said that he did not see the vessel before she was struck.

Johnson, the mate on the Queens, said that when he first saw the Waubesa she was about 100 feet away, and he then sang out to the captain "full speed astern."

Lewis, the mate and lookout on the Mayor Gaynor, testified that he never saw the Waubesa until he was about 35 feet from her.

White, the deckhand, testified that he could see probably 100 feet.

Capt. Merli of the Queens testified that the night before the collision he had in mind

the Waubesa, and on the morning of the collision attempted to navigate his boat "a half a point more to the south, to give me a good clearance." He said: "I saw her several days previous to that, but I could not say the actual day."

Silva, the pilot of the Queens, likewise testified that they changed their course from "west southwest to southwest by south, half south," because "there was a steamboat laid about off of Greenville which caused us to change our course one-half point, to give her good clearance."

Capt. Robinson of the Mayor Gaynor also testified that he steered a different course that morning, "knowing that there was a vessel ahead which laid in the channel."

More evidence might be referred to regarding the speed of the ferryboats and their inability to stop within striking distance.

In the recent case of The Watuppa (C. C. A.) 283 F. 8, it was held negligent to proceed in a dense fog in New York Harbor, even at the rate of 2½ to 3 knots per hour.

The Inland Rules, art. 16 (Comp. St. § 7889), require a vessel to run at "moderate speed" in a fog. Under the same section it is provided that:

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel, the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

It is unnecessary to multiply authorities in the face of the regulations and the well-known rules of law.

[1] The city of New York is unquestionably solely liable both to the United States of America and to the Grain Corporation for damages arising out of the collision, unless the Waubesa was at the time of the collision anchored in the channel, in which event I think the damages arising out of the collision should be divided. The decision in Jova Brick Works v. City of New York (C. C. A.) 277 F. 180, cannot help the city. There the colliding vessel was properly and carefully navigated, while here the ferryboats were proceeding at a rate of speed without which the accident need not have occurred.

Coming to the question of the position of the Waubesa, the evidence as usual is somewhat conflicting, and a determination cannot be reached that is completely satisfactory. Counsel for the Grain Corporation comments upon the fact that Johnson, the third

8 F.(2d)—18

officer of the Waubesa, who took the bearings when she anchored, testified that these bearings were taken from the bridge. Counsel further argues that the testimony of Sims, the second officer, shows that the marks on the chart (Exhibit B-2) indicate the position of the Waubesa's bridge after she had swung and tautened her chain, and, if the Sims location be taken as the true position, when the Waubesa swung on her chain to the eastward she would be carried in part at least into the fairway. This is perhaps true if the ship swung out at an angle of 90 degrees horizontally on the channel. At the time of her first collision, however, it was but about two hours before flood tide and there was an easterly breeze of 12 miles an hour. If the position given the ship by Sims is correct, I cannot see how the wind and tide conditions would bring the vessel into the fairway.

Another argument made by counsel for the Grain Corporation is based upon the fact that the log of the Waubesa states that the vessel was "anchored off Sta. of Liberty 9 fath. of water." The point where the general anchorage (see Exhibit 8) is marked with the figure 54 is only about 150 yards from the easterly side of the anchorage ground. If the Waubesa, at the time of the accident, had been swinging in a line directly across the fairway, it is probable that her stern, with the length of chain she had out, would have extended into the channel. Both the tide and the wind, however, seem to have been against such a position. The warning by men of the United States Coast Guard is urged as a reason for believing that the Waubesa was not on anchorage grounds. The warning by Christiansen seems to have been based upon the fact that the Leviathan was about to go out, and was accustomed to pass close to the anchorage ground in order to take advantage of the deepest water which is along such a course.

The other coast guard, Goldbeck, testified that Christiansen "was in doubt about" the anchorage of the Waubesa and warned her. Goldbeck said that prior to the 16th, in his various tours, the Waubesa was not in the channel; on the 16th he thought she might be in the channel and warned her. Because of the haze, he was not able to get bearings from any landmark, and he merely estimated the position of the Waubesa. When he came to plot her position on Exhibit 28, he placed her inside the anchorage ground.

The fact of the matter is that these warnings seem to have originated with extra precautions taken by the Coast Guard,

to be sure that the huge Leviathan had ample room, and they persisted without very much knowledge on the part of the Coast Guard of the real position of the vessel.

It is to be noted that McLaughlin, the pilot who took out the Leviathan, testified that he passed out "right straight down the edge of the anchorage ground," and that he only remembers two vessels anchored at the place in question that interfered with him— one a United Fruit boat, and the other a Norwegian bark. He said, in referring to the anchorage, that he kept "just on the edge where the water is best, just as near the anchorage as I can."

The testimony of McLaughlin is not so important as showing whether or not the Waubesa was on or off the anchorage ground at the time of the accident, but it does show how very close to the anchorage ground the Leviathan went in order to secure the deepest water, and indicates why the Coast Guard was zealous in warning all vessels anywhere near the boundary to get back. It was the safe course to take, particularly as the Coast Guard could not tell the length of their anchor chain and in what position they might be at certain states of wind and tide. It does not go far in showing that the Waubesa was in the fairway at the time of the two collisions.

The pilot Anderson had long experience in anchoring vessels in New York Harbor, and swears that he first anchored her according to his own judgment, and within a short time, when the weather cleared sufficiently, obtained his customary range which in fact is safely within the anchorage grounds.

I was considerably impressed at the trial by the fact that two Staten Island ferryboats each collided with the Waubesa. Undoubtedly the navigators of this harbor craft are very experienced, but it is to be remembered in this particular case that the fog was dense, the ferries had to slow down at times, which introduced an additional element of chance in attempting to navigate. The breeze and tide both tended to set them over against the anchorage ground. There is no doubt that these forces of wind and tide so deflected the ferries from their customary course that they passed further to the west than they intended. The only question is whether the Waubesa had swung out into the fairway so that she was beyond her anchorage ground. A number of witnesses, who claim that she was off the anchorage ground, showed, on cross-examination, that they did not know where it was and completely failed to locate it on the chart.

[2] I do not give much weight to the fact that the compasses on the ferryboats were not correct, and that the masters had no deviation charts. If they knew how to sail from day to day by their compasses, correct or incorrect, that would answer the purpose. The difficulty was that these vessels were proceeding in a dense fog at a rate of speed which put them beyond control. I am inclined to think that they got considerably out of their courses, and that this was the cause of the collision. At any rate there is not sufficient proof to satisfy me that the Waubesa was in the fairway at the time of the collision, and another clear explanation of the collision has been furnished. The Newburgh, 130 F. 321, 64 C. C. A. 567. As for the testimony that she lay at right angles to the fairway, I think it is not entitled to great weight. Her angle in a dense fog cannot have been observed with any certainty. It is more likely to be correctly determined by her original bearings, the length of her anchor chain, and the course of the wind and tide at the time of the accident.

[3] The claim that the city of New York cannot limit its liability because its regulation for the municipal ferries contravened the Inland Rules seems to me without merit. Regulation 26 reads as follows:

"In a fog, mist, falling snow or heavy rainstorms, boats must run at half speed, or less, having careful regard to the existing circumstances and conditions. If the weather is so thick or foggy that the regular advertised schedule cannot be maintained with safety to the ferryboats they will be run slowly and cautiously without regard to the schedule and proceed with great care and caution."

Article 16 of the Inland Rules (Comp. St. § 7889) says:

"Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions."

It is contended that the words "boats must be run at half speed or less" suggest running at half speed under unsafe conditions. I see no ground for this. Each regulation prescribes a caution and a limitation of speed dependent on the circumstances. It might as well be argued that the municipal regulation imposed greater moderation rather than less. In my opinion the two regulations are equivalents. There is no proof that the city regulation was not made in good faith. The words of the Supreme Court

in La Bourgogne, 210 U. S. at page 126 (28 S. Ct. 675, 52 L. Ed. 973), are applicable:

" * * * The petitioner having shown the promulgation of regulations for the conduct of its business, which exacted a compliance by the captains of its vessels with the international rules, we think the burden of proving that the rules were not promulgated in good faith or that a willful departure from their requirements was indulged in, and was brought home to or countenanced by the petitioner, was cast upon the claimants, and that the court properly held that that burden was not sustained by the evidence."

In my opinion the municipal regulations, while differently phrased, were in entire accordance with the Inland Rules, and the city sustained the burden imposed by law of proving the absence of privity in respect to undue speed in a fog.

The Grain Corporation contends that the ship was unseaworthy because oil leaked from the tank and got into the grain, and that for this reason the exceptions in the bill of lading and under the Harter Act (Comp. St. §§ 8029-8035) are not applicable.

The government produced Mr. Stinchcomb, surveyor of the New York Board of Underwriters, who testified that he examined the vessel at Philadelphia on February 25, 1919, in respect to her fitness for carriage of grain, and found her tight and in proper condition.

Octavius Narbeth, the surveyor for Lloyds, had the Waubesa examined prior to the voyage and furnished a certificate; the inspection having been made by George J. Freemantle. Mr. Freemantle testified that he inspected the work as the construction of the ship proceeded, and that the tanks and bulkheads were tight.

Nevertheless there is the testimony of Capt. Goble, the master of the Waubesa, that there was oil in Nos. 1 and 2 bilges at Philadelphia, and this is borne out by the contemporaneous entries in the log of the vessel. Adams, the chief engineer of the Waubesa, testified to the same effect. The log shows that the soundings continued to show oil, and that the amount shown did not greatly increase after the collision. There is no testimony that oil was seen to have permeated the grain prior to the date of the collision, and there hardly could be any, for the reason that the grain was stowed in the hold and could not be inspected without removal. The amount of oil on the port side of bilges Nos. 1 and 2 was at times of such

great depth, if the soundings are to be taken literally, that it would have come, not only above the oil tank tops, but above the ceiling of the hold. It is evident that the linked rod with which the soundings were taken did not measure accurately, for it would seem to be quite impossible that such soundings as were recorded could be correct, for the oil would have passed over the tank tops into the starboard bilge and shown something like a corresponding quantity there. Nevertheless we have the soundings disclosing oil in the bilges, which was known to be there when the vessel was at Philadelphia, and the recommendation of the board of survey at New York that the vessel discharge her cargo from holds 1 and 2 before sailing in order to get at the source of the trouble and remedy it. Mr. Hargan, who surveyed the Waubesa after the accident, then found a hole in one of the ballast tanks which had been plugged with a wooden plug at the time the vessel was first built, and through which he thought oil came from the oil tanks and flowed down into the bilges. I find no contradiction of Mr. Hargan's testimony. There is evidence of injury of the grain in holds Nos. 1 and 2 from oil.

[4] Elmer R. Knox, Jr., deck officer on board the Waubesa, a witness who made a very good impression, testified that when the vessel was beached after the collision, and lay on the mud flats, she listed to port. This explains Hargan's testimony that the oil damage in holds 1 and 2 was all on the port side of the shifting boards. This testimony from an excellent witness practically demonstrates that the oil was not sufficiently deep to reach the grain, whether by seeping through the ceiling of the hold or otherwise except when the vessel was listed. It seems clear, therefore, that oil which had leaked from the tanks caused the damage in holds 1 and 2, and that the collision and the resulting beaching of the vessel contributed to this damage.

[5] The suit by the Grain Corporation against the United States is for failure to deliver the grain shipped and receipted for in good order in accordance with the terms of the bill of lading. As Goble, the master, and Glen, the inspector for the United States Shipping Board, both said, the trip was really a trial trip, though the voyage for which the cargo was shipped was from Philadelphia to Falmouth. The vessel left Philadelphia with oil in her bilges under the protest of her engineer, and in substance that of her master also. The soundings,

however accurate, showed a large amount of oil in her bilges, and this oil, when the vessel listed as a result of the accident, damaged the grain in holds 1 and 2. It seems clear that the vessel should not have left Philadelphia under such circumstances, and that she was unseaworthy for the carriage of grain. Moreover, the trial trip was a deviation by an unseaworthy vessel that deprived the Waubesa of the benefit of the exceptions in the bill of lading and the provisions for exemption of the Harter Act. The St. Paul (D. C.) 277 F. 99; The Elizabeth Dantzler (D. C.) 263 F. 596. The Waubesa was not definitely proceeding on her voyage, but only going to New York, and then on in case she was found fit and after she was satisfied that the oil could be pumped out and did not imperil the cargo. New York was not a port of refuge, but a stopping place for convenience on a trial trip, which, irrespective of the delay caused by the collision, proved to be a stopping place of long duration because of the condition of the vessel. I can hardly see a more fit application for the doctrine of deviation.

Under such circumstances, if the vessel were not government owned, the Grain Corporation could recover damages to her cargo, and the owner of the Waubesa would have the right to recover over from the city of New York the total damages to the grain caused by water in holds 4 and 5, and one-half the damages caused by oil in holds 1 and 2. The city could limit in all cases.

The United States has filed exceptions to the jurisdiction because: (1) The Waubesa was not employed as a merchant vessel, but was engaged in public business; (2) the libel is for the sole benefit and account of private underwriters; (3) the policies of insurance issued by underwriters were issued to an agency of the United States, hence the underwriters are not in a position to sue; (4) any money paid by underwriters should inure to the benefit of the United States.

[6] In order to establish that the Waubesa was not employed as a merchant vessel but was engaged in public business, counsel for the United States has introduced documentary proof that the Grain Corporation was incorporated by the United States in pursuance of an executive order, and that by executive orders the president managed the corporation and arranged for an increase and decrease of its capital stock; that the government owned the stock of the corporation, and that by executive order its liquidation was provided for, and the assets were to be paid into the Treasury of the United States. The government also showed that the Grain Corporation, in delivering the grain shipped on the Waubesa, which was shipped under a bill of lading providing for delivery to the order of the United States Grain Corporation, c/o American Embassy, London, was really engaged in the relief of the starving countries in the East, and not in the mercantile business. The case of The Western Maid, 257 U. S. 419, 42 S. Ct. 159, 66 L. Ed. 299, is relied upon. That vessel, like the Waubesa, was owned by the United States and was engaged in transporting food stuffs for the relief of the civilian population of Europe. The Supreme Court said (Mr. Justice Holmes writing for the majority):

"* * * It is suggested that the Western Maid was a merchant vessel at the time of the collision, but the fact that the food was to be paid for and the other details adverted to in argument cannot disguise the obvious truth, that she was engaged in a public service that was one of the constituents of our activity in the war and its sequel and that had no more to do with ordinary merchandising than if she had carried a regiment of troops."

The same view was taken by the Supreme Court in the recent case of United States Grain Corporation v. Phillips, 261 U. S. 106, 43 S. Ct. 283, 67 L. Ed. 552, decided February 19, 1923, where a naval officer carried gold from Constantinople to New York on the steamship Laub, a destroyer in the navy. This gold was being forwarded on the Laub, in payment by Bulgaria for wheat furnished by the Grain Corporation, and the captain of the Laub, under a statute applicable to shipments by private persons or corporations, claimed a commission for the carriage of the gold. The court said that in substance the gold was the property of the United States, and, while the legal title was in the Grain Corporation, and the property of that corporation might have been taken to pay a judgment rendered against it, yet the property was clothed with such a public interest "that the transportation of it no more could be charged for by a public officer than the carrying of a gun, we must look not at the legal title only but at the facts beneath forms."

The counsel for the Grain Corporation endeavors to distinguish these cases on the ground that in the case at bar the Grain Corporation employed its own assets in purchasing the grain, instead of carrying grain

as in the Western Maid, purchased with funds appropriated directly by Congress; that it also insured the grain, as is not done in a direct government transaction, and paid freight to the Waubesa and received bills of lading therefor. The proof shows, however, that the object of the governmental activities was the relief of Europe, and that any profit over cost which the Grain Corporation may have made was only for the purpose of paying interest on moneys advanced to purchase supplies to relieve the famine stricken countries. I cannot regard the distinctions as sufficient to take the case out of the sweeping decisions in The Western Maid and United States Grain Corporation v. Phillips, supra.

Advances by the underwriters to cover damage to the grain cargo have been made in consideration that "best endeavors to recover the value of the flour * * * from any and all persons and corporations who may be liable therefor" would be exercised. Such a clause cannot, however, create a right on the part of the Grain Corporation against the United States when the latter has not by appropriate legislation consented to be sued. The Western Maid and the case of United States Grain Corporation v. Phillips preclude any such result. Whether or not the warranty in the insurance policies that the insurance shall not inure directly or indirectly to the benefit of the carrier is sufficient to avoid the insurance in this case, because of the fact that the United States Grain Corporation, as well as the United States Emergency Fleet Corporation, really belong by reason of stock ownership to the United States, is not a matter for determination in this litigation. I cannot see that these warranties, or the clause in the loan receipts, that "the Grain Corporation shall use its best endeavors to recover the value of the flour * * * from any and all persons and corporations who may be liable therefor, * * *" can affect the rights of the parties here.

[7-9] While it is true that, if the Waubesa had under the meaning of the decisions been a "merchant vessel," the damages suffered by the Grain Corporation would have been divided as between the city of New York and the United States, yet the Grain Corporation itself would have been entitled to recover the whole of its damages against either wrong doer. The Beaconsfield, 158 U. S. 303, 15 S. Ct. 860, 39 L. Ed. 993. The English rule that owners of the cargo could only recover one-half of their damages from each party does not apply in our courts. Ralli v. Societa Anonima di Navigazione (D. C.) 222 F. at page 998. Inasmuch, however, as neither the United States nor the Waubesa are liable to suit, the grain corporation may prove its full damages against the city of New York, subject to the right of the latter to limit. In the proof of its claim against the surrendered vessels or their proceeds, the claim for damages of the United States for injuries to the Waubesa should be deferred to the claim of the Grain Corporation, since the Waubesa was unseaworthy and guilty of a deviation. The George W. Roby, 111 F. 601, 49 C. C. A. 481.

In the first libel, an interlocutory decree is granted to the United States against the city of New York with right of the latter to limit damages to proved value of surrendered vessels. The cross-libel of the city of New York, against the United States of America is dismissed for want of jurisdiction.

In the second libel, brought by the United States Grain Corporation against the city of New York, an interlocutory decree is granted to the libelant, with the right to the city of New York to limit the amount of damages to proved value of the surrendered vessels. The petition impleading the United States of America is dismissed for want of jurisdiction. There are two claimants to the same fund in the foregoing libels, namely, the United States and the United States Grain Corporation, and the causes have all been tried together. For the reasons hereinbefore stated, the claim for damages of the United States for injuries to the Waubesa should be deferred to the claim of the Grain Corporation, since the Waubesa was unseaworthy and guilty of a deviation.

The third libel brought by the United States Grain Corporation against the United States of America is dismissed for want of jurisdiction, and the petition by the United States of America, impleading the city of New York, is dismissed.

Settle decrees on notice.