## THE CITY OF BRUNSWICK.

## SANDAY et al. v. UNITED STATES, and nine other cases.

### Nos. 497, 498, 500, 505–510, 512.

District Court, D. Massachusetts.

Aug. 18, 1933.

No. 497:

Bigham, Englar, Jones & Houston, of New York City, and Burnham, Bingham, Gould & Murphy, of Boston, Mass., for libelant.

Frederick H. Tarr, U. S. Atty., of Boston, Mass. (A. Chesley York, Asst. U. S. Atty., of Boston, Mass., of counsel), for the United States.

No. 498:

Burnham, Bingham, Pillsbury, Dana & Gould, of Boston, Mass., for libelants.

Frederick H. Tarr, U. S. Atty., of Boston, Mass. (A. Chesley York, Asst. U. S. Atty., of Boston, Mass., of counsel), for the United States.

No. 500:

Abbott, Fauntleroy, Cullen & Edwards, of St. Louis, Mo., Bigham, Englar, Jones & Houston, of New York City, and Burnham, Bingham, Pillsbury, Dana & Gould, of Boston, Mass., for libelants.

Frederick H. Tarr, U. S. Atty., of Boston, Mass. (A. Chesley York, Asst. U. S. Atty., of Boston, Mass., of counsel), for the United States.

Nos. 505–508:

Bigham, Englar, Jones & Houston, of New York City, and Burnham, Bingham,

Pillsbury, Dana & Gould, of Boston, Mass., for libelants.

A. Chesley York, Asst. U. S. Atty., of Boston, Mass.

No. 509:

Burnham, Bingham, Pillsbury, Dana & Young, of Boston, Mass., and Bigham, Englar, Jones & Houston, of New York City, for libelants.

A. Chesley York, Asst. U. S. Atty., of Boston, Mass.

No. 510:

Barbour, McDavid & Barbour, of Springfield, Mo., Bigham, Englar, Jones & Houston, of New York City, and Burnham, Bingham, Pillsbury, Dana & Gould, of Boston, Mass. (F. W. Barrett of Springfield, Mo., of counsel), for libelants.

Frederick H. Tarr, U. S. Atty., of Boston, Mass. (A. Chesley York, Asst. U. S. Atty., of Boston, Mass., of counsel), for the United States.

No. 512:

Burnham, Bingham, Pillsbury, Dana & Gould, of Boston, Mass., and Bigham, Englar, Jones & Houston, of New York City, for libelants.

Frederick H. Tarr, U. S. Atty., of Boston, Mass. (A. Chesley York, Asst. U. S. Atty., of Boston, Mass., of counsel), for the United States Shipping Board Emergency Fleet Corporation.

LOWELL, District Judge.

These are ten suits brought against the United States Shipping Board Emergency Fleet Corporation and United States of America for the loss of cargo loaded on the City of Brunswick at New Orleans and Mobile in July and August, 1921. The vessel was built at the Oscar Daniels Shipyard at Tampa, Fla., and, after taking on her cargo, proceeded on her voyage, but was lost by stranding. She was the last of ten vessels of the same size built at this shipyard for the United States government. She left Tampa on July 19, 1921, and proceeded to New Orleans, where she took on part of her cargo. She then proceeded to Mobile, and loaded the rest of the cargo. She left Mobile on August 13, 1921, on a voyage to Antwerp. During the voyage the boilers would not function properly, owing to the fact that the condenser leaked, which caused the tubes in two of her three boilers to blow out. When this condition was discovered, the vessel was ordered by the Shipping Board to go into Halifax for repairs. The weather on the voyage was calm. The vessel ran on a reef at the entrance to Halifax Harbor, and was totally lost with all her cargo.

Three of the cases were tried before me on June 8, 1927, when I decided for the libelants. The other cases were tried before the Court of Claims in Washington. Since that time the United States Supreme Court has decided that the cases were not properly brought, for jurisdictional reasons. U. S. Shipping Board Emergency Fleet Corp'n v. Cal. Wine Ass'n (The West Aleta), 276 U. S. 202, 48 S. Ct. 256, 72 L. Ed. 531. After that a remedial act was passed through Congress, and it is admitted that all the suits here brought were properly prosecuted under the terms of that act.

The testimony of the many witnesses was taken almost entirely by deposition; the only oral evidence being that of Professor Jack, Mr. McNaught, and one other at the former trial, and Mr. Jordan at the present trial.

The contentions of the libelants are that the Shipping Board is responsible because, even if the stranding was due to negligent navigation, the vessel was not seaworthy when it left New Orleans or Mobile, and, under the terms of the Harter Act (46 USCA §§ 190–195), the vessel cannot exempt itself from liability for negligent navigation, unless it is proved that she was seaworthy or that due diligence was used to make her so. There is also the question of whether there was a deviation, in which case the Shipping Board became an insurer of the cargo and was liable for whatever happened to it.

The defective machinery which the libelants allege rendered the vessel unseaworthy was the condenser, the feed pumps, and the telemotor steering mechanism. Only the first need be considered. The vessel was equipped with three Foster water-tube boilers, two feed pumps, and one condenser. In a water-tube boiler the steam is generated in the tubes instead of in a larger container, which was the practice in the older so-called Scotch boilers. In both kinds of boilers there is danger of the parts of the boiler becoming weak through the deposit of impurities from sea water, which gets into the boiler principally from the leaking of the condenser. A condenser is a large chest having many tubes running through it. It is operated by salt water, which is pumped in on one side and discharged on the other. Only fresh water is used in the operation of the boiler, and it is used over and over. The function of the condenser is to condense the steam, which comes from the engine after it has been used,

into water. It is delivered from the condenser to the so-called "hot well," whence it is pumped back into the boiler, goes through the engine, and completes its circulation by being returned to the condenser. If the condenser tubes leak, as they are full of salt water, they contaminate the fresh water used for the operation of the boiler, and it is from this source that the danger to the boiler arises. Certain magnesium and lime particles held in solution in salt water become incrusted in the boiler and thereby interfere with its action to such an extent that the boiler is apt to burn out. This is due to the fact that the parts of the boiler which are in connection with the furnace become so incrusted that they do not impart their heat to the water in the boiler, but are burned themselves. The danger of this burning is greater in water-tube boilers than in the Scotch boiler, because the tubes which hold the water which is to be turned into steam are so small that a slight incrustation of the foreign matter will be as dangerous as a much greater one in the larger space of a Scotch boiler.

The vessels built for the Shipping Board by the Daniels Shipyard had been in process of construction for about two years, and it was in evidence that the condensers had been delivered to the yards about two years before the City of Brunswick was launched. The City of Brunswick left Tampa for New Orleans on July 19, and took two days to make the trip. The condenser had been lying out in the yard for two years. It was thoroughly repacked at Tampa before the vessels started for New Orleans. It had about eighteen hundred tubes in it. The condenser was a box about nine feet long, through which the condenser tubes passed. Where the tubes entered the casing, they were so arranged as to allow for a change in length, to make up for the effect on the tubes of varying temperatures. The tubes passed through the casing, leaving a small space for packing, which is held in place by a nut called a ferrule. The packing is a very important part of the condenser, as, if it gives out, there will be a leak, which will enable salt water to get into the boiler. When the vessel arrived at New Orleans, it was found that many of the tubes in the condenser were leaking. The condenser was not thoroughly repacked, as the chief engineer requested, but, after a test, only those tubes were repacked which showed leaks.

No trouble was found with the condenser on the trip from New Orleans to Mobile, but several days after it had left Mobile it began to leak to such an extent that some of the water tubes in two of the three boilers gave out, and the vessel had to proceed to Halifax under one boiler. The power generated by one boiler was much less than if all three boilers had been in commission. The vessel struck the reef quite lightly, and there was evidence that, if the three boilers had been in commission, she could have been backed off.

The vessel had not been finally accepted by the Shipping Board when she left Mobile, and was tested on a sixteen-hour trial trip from Mobile out to the Gulf and back to Pensacola Buoy, where the officers who were conducting the test were sent back on a tug.

■ The contention of the Shipping Board is that the condenser was properly repaired at New Orleans and was seaworthy when it left that port, and also when it left Mobile. As has already been said, the condenser was not entirely repacked at New Orleans, but only three hundred or four hundred tubes, which were shown by a test to be leaking. Expert oral evidence was offered before me on both trials that this was not a proper repair, for the reason that when as many as three hundred or four hundred tubes were found to be leaking after a voyage as short as that from Tampa to New Orleans, when the whole condenser had been repacked shortly before, it showed conclusively that the job was badly done and that the other tubes, which did not then show evidence of leaking, would probably leak very soon. This expert evidence seems to me conclusive, and I rule that the condenser was not seaworthy when it left New Orleans, and also when it left Mobile, and that due diligence had not been used to make it so.

■ I am satisfied on the evidence that, while the stranding resulted from negligent navigation, the vessel and cargo would not have been a total loss if all the boilers had been in proper condition, as the vessel could have been backed off the reef.

■■ The question of deviation remains to be considered. The direct route from Mobile to Antwerp was a different one from that which the vessel took as it went on a sixteen-hour trip from Mobile out into the Gulf and back to Pensacola Buoy. It is required of a carrier of goods by sea that he furnish a seaworthy vessel at the beginning of the voyage and that he complete the voyage by the nearest route to the destination. In this case in a sense the Shipping Board did not furnish a vessel at New Orleans or Mobile, as she was not accepted by the Board until after she had left Mobile, gone out into the Gulf, and returned to Pensacola Buoy. This might raise

an interesting question of law, but it need not be further considered, as it seems perfectly clear on the authorities, and indeed on common sense, that a trial trip is not a customary part of a voyage from loading place to destination; and where, as in this case, on the trial trip the vessel went out of the usual course from Mobile to Antwerp, there seems no question that it was guilty of a deviation. United States v. City of New York (The Waubesa) 8 F.(2d) 270 (D. C.); The Willdomino, 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491.

 The deviation was not excused by the liberty clauses in the bills of lading issued at New Orleans and Mobile. They provided, among other things, that the shipowner might have liberty to proceed to any port or ports in any order, etc. In this instance the vessel did not proceed to the port of Pensacola, as the gentlemen who were acting as a trial board were transferred to a tug at Pensacola Buoy. The Ixia, [1932] A. C. 328.